UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

D'ANDRE ALEXANDER,

          Plaintiff,

v.

NICHOLAS CALZETTA, *et al.*

          Defendants.

_____/

Case No. 2:16-cv-13293
District Judge Mark A. Goldsmith
Magistrate Judge Anthony P. Patti

# OPINION AND ORDER DENYING STATE DEFENDANTS' MOTION TO SEVER BASED ON MISJOINDER OF PARTIES AND CLAIMS (DE 20)

## I. OPINION:

### A. Plaintiff brings his lawsuit against 18 defendants associated with various MDOC locations.

D'Andre Alexander (#731077) is currently incarcerated at the MDOC's Macomb Correctional Facility (MRF) in New Haven, Michigan. *See* www.michigan.gov/corrections, "Offender Search." On September 8, 2016, while incarcerated at MRF, Hoosier filed the instant lawsuit against **18 defendants**, who are described as follows:

- **nine (9) Defendants** are associated with the MDOC's Marquette Branch Prison (**MBP**) (Calzetta, Govern, Giesen, Viitala, LaCount, Niemisto, Huss, Salmi and Meden), *which is located in Michigan's upper peninsula*,

- **eight (8) Defendants** are associated with the MDOC's Woodland Center Correctional Facility (**WCC**) (Saad, Rosen,

1

> Watkins, Lewis, Lee, Slaughter, Houston and Idemudia), *which is located in Whitmore Lake, Michigan*, and

- **one (1) Defendant** is associated with the **MDOC's Office of Legal Affairs** (Johnson).

(DE 1 at 2 ¶¶ 5-12.) The facts underlying his complaint span the period from February 2, 2015, when Plaintiff was incarcerated at MBP, through February 2016, when Plaintiff was incarcerated at WCC. (DE 1 at 2 ¶ 4, DE 1 at 3-7 ¶¶ 13-48.)

This case has been referred to me to conduct pretrial matters. (DE 8.)[1]

**B. Eight defendants have appeared, each of whom is associated with MBP.**

Of the eight defendants who have appeared, seven are State Defendants (Nicholas Calzetta, Fred Govern, Darrin Viitala, Mandi Salmi, Kenneth Niemisto, Kristine Giesen, and Chad LaCount) and one is Terry Meden, M.D. (DE 1 ¶¶ 5-6, 8-9; DEs 19, 25 and 26; *see also* DEs 10-16 and 18.) Each of these defendants is identified as being associated with MBP. (DE 1 ¶¶ 5-9.)[2]

---

[1] As will be mentioned later in this report, Plaintiff is a party to more than one case in this district. *See Alexander v. Hoffman et al,* Case No. 2:15-cv-10294-DML-RSW (E.D. Mich.) (filed on 1/23/15 and dismissed on 6/7/16); *Alexander v. Nietzel*, Case No. 2:16-cv-12071-NGE-PTM (E.D. Mich.) (filed 6/6/16); *Alexander v. Vittitou et al*, Case No. 2:16-cv-12072-SJM-MKM (E.D. Mich.) (filed 6/6/16, judgment entered 12/12/16, notice of appeal filed 1/17/17); and *Alexander v. Hoffman et al*, Case No. 4:16-cv-12069-TGB-MKM (E.D. Mich.) (filed 6/6/16).

[2] Huss is the only MBP defendant who has not appeared.

On November 29, 2016, the seven State Defendants filed a motion to sever based on misjoinder of parties and claims. (DE 20.) A response, a reply and a sur-reply have been filed. (DEs 22-24.) In addition, Defendant Meden has filed a concurrence in and adoption of the State Defendants' motion. (DE 27.) Attempts at service upon the ten remaining Defendants are ongoing. (DE 28-30.)

### C. Fed. R. Civ. P. 20 ("Permissive Joinder of Parties")

Federal Rule of Civil Procedure 20 provides as follows with respect to joinder of multiple parties in a single lawsuit:

> Persons . . . may be joined in one action as defendants if:
>
> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or *arising* out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will *arise* in the action.

Fed. R. Civ. P. 20(a)(2) (emphases added). Thus, when joining multiple defendants in a single action, both elements of the two-part test of Rule 20(a)(2) must be met.[3]

---

[3] Rule 18 governs the joinder of claims. However, in "actions involving multiple defendants Rule 20 operates independently of Rule 18." *Proctor v. Applegate*, 661 F.Supp.2d 743, 778 (E.D. Mich. 2009). Accordingly, the instant motion will be analyzed under Rule 20.

The joinder of claims, parties, and remedies is "strongly encouraged" when appropriate to further judicial economy and fairness. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966). However, parties are not entitled to join multiple defendants in a single suit when the claims are unrelated. *See, e.g., Payne v. Corr. Corp. of America*, 194 F.3d 313, at *1 (6th Cir. 1999) (concluding severance was proper where the claims did not arise from the same transactions or occurrences); *see also Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) (upholding the trial court's dismissal of "wholly unrelated claims" against misjoined parties).

### D. Discussion

#### 1. The alleged facts underlying Plaintiff's complaint span a one year period and took place at two different correctional facilities.

The factual allegations underlying Plaintiff's complaint, and the locations discussed therein, paint the following timeline:

##### a. Facts underlying Plaintiff's claims against 10 MBP Defendants (February 2015 through January 2016)

- On February 2, 2015, seemingly while incarcerated at MBP, Plaintiff was involved in a fight and taken to segregation. While this was happening, prison staff intentionally allowed his television to be stolen in retaliation for filing grievances and for filing a lawsuit less than two weeks earlier (Case No. 2:15-cv-10294-DML-RSW (E.D. Mich.)). (DE 1 ¶ 13.)

- When Plaintiff discovered who had the television, he notified an officer who went to retrieve it. (DE 1 ¶ 14.) Thereafter,

Plaintiff was labeled a "snitch," a hit was ordered, and Plaintiff was targeted. (DE 1 ¶ 15.) Plaintiff claims he was threatened that "he would be stabbed and jumped by the gang members if he returned to [the] general population." (DE 1 ¶ 16.)

- On May 6, 2015, in handcuffs, Plaintiff met with Salmi, informed her of what had happened, and asked to be placed in F-block's ICP (Intermediate Care Program). According to Plaintiff, F-block is "a secure unit where prisoners ha[v]e no direct opportunities to have physical contact with each other." (DE 1 ¶ 17.) Salmi "refused to report the safety need . . .[,]" and did not "document the notification of the safety risk." (DE 1 ¶ 18.)

- On May 11, 2015, Plaintiff informed Govern of the safety risk and requested protection. However, Govern did not "act on the situation." (DE 1 ¶ 19.)

- On June 3, 2015, in MBP's Q-block, Plaintiff informed Huss of the safety risk and requested protection. Huss believed the situation was only about a television and did not "attempt to report and[/]or intervene" regarding the safety risk. (DE 1 ¶ 22.)

- On June 16, 2015, Plaintiff informed Giesen about the safety risk and "requested to be called out to talk more in depth" about it. He also gave her a handwritten notice which requested protection. (DE 1 ¶ 20.)

- On June 17, 2015, Plaintiff asked Giesen how she was going to handle the protection request. Giesen did not "attempt to report or intervene . . . ." (DE 1 ¶ 21.)

- On June 18, 2015, Huss and LaCount came to Plaintiff's cell, and Plaintiff told them about his need for protection. Plaintiff gave LaCount a written summary of the situation, in which he requested protection. Defendant Huss did not carry out the assurance that he would "take care of it." (DE 1 ¶ 23.)

5

- On June 19, 2015, Giesen told Plaintiff, "Why should I help you? All you do is write complaints on staff here." (DE 1 ¶ 21.)

- On July 6, 2015, Meden offered to have Plaintiff taken out of segregation and sent to MBP's G-block, where there was a Secure Status Outpatient Treatment Program (SSOTP). (DE 1 ¶ 24.) Plaintiff responded that he could not be placed in the general population, because of what had happened. He asked to be placed in F-block, where there would be "no physical contact with prisoners." (DE 1 ¶ 25.) Meden agreed and had Plaintiff "signed up for ICP placement in F-block." (DE 1 ¶ 26.)

- On July 16, 2015, Niemisto offered to release Plaintiff from segregation, presumably to MBP's general population. Plaintiff informed Niemisto of the situation and gave Niemisto a written account of the incident, but Niemisto "did nothing to accom[mo]date Plaintiff's protection needs." (DE 1 ¶ 44.)

- On August 11, 2015, Plaintiff was placed into F-block. (DE 1 ¶ 27.)

- On August 21, 2015, Daphne M. Johnson of the MDOC's Office of Legal Affairs responded to Plaintiff's July 16, 2015 request for a declaratory ruling. According to Plaintiff, Johnson failed to act, refused to issue a ruling, and ignored his request. (DE 1 ¶¶ 45-46, DE 1 at 13.)

- On December 24, 2015, Plaintiff was placed into segregation "due to a false misconduct." (DE 1 ¶ 27; DE 1 at 17.)[4]

---

[4] Plaintiff's grievance response indicates that he was on observation from December 24, 2015 to December 30, 2015. From December 30, 2015 to January 26, 2016, he was housed in MBP's "Delta Block." (DE 1 at 17.)

- On January 22, 2016, Salmi offered to take Plaintiff out of segregation and send him to MBP's G-block, where there was an SSOTP. (DE 1 ¶ 27.) Plaintiff declined, reiterated the situation, and asked for protection/transfer. However, Salmi did not attempt to intervene or report the safety risk. (DE 1 ¶ 28.)

- On January 25, 2016, Calzetta asked Plaintiff "to agree to leave segregation and go to 'G-Block.'" Plaintiff informed Calzetta of the safety risk and requested protection. Calzetta responded in part by revealing that he had been informed by Govern "how those guys want [Plaintiff's] head!" Thereafter, Viitala denied Plaintiff's request for protection due to "beefing with Govern." (DE 1 ¶ 29.)

- On January 26, 2016, Meden offered to have Plaintiff sent to WCC, Plaintiff responded that he was not comfortable with transfer to WCC and reiterated his safety concern. Meden "stated he would not have Plaintiff sent there." (DE 1 ¶ 30.) On January 27, 2016, Plaintiff was informed that he was going to be transferred to WCC. Plaintiff let it be known that "he did not approve of the disregard of his safety risk." (DE 1 ¶ 31; *see also* DE 1 at 17.)

### b. Facts underlying Plaintiff's claims against 8 WCC Defendants (January 2016 through February 2016)

- Plaintiff informed WCC staff about the hit placed on him and that he was in fear of his safety. Saad, Rosen and Watkins were present. (DE 1 ¶ 32; *see also* DE 1 at 17.)

- At some point, an inmate heard Plaintiff talking about the hit on him to another prisoner. The inmate who overheard the conversation "announced himself as a member of the gang that put the hit on [Plaintiff] and <u>then attacked [him]</u>." (DE 1 ¶ 33 (emphasis added).) According to Plaintiff, he did not defend himself and sustained a right ear injury, for which he sought

treatment. Lewis and Lee then "had the inmate placed in his cell." (DE 1 ¶ 34; DE 1 at 12.)[5]

- Saad and Rosen refused to accommodate Plaintiff's need for protection. (DE 1 ¶ 35.) Lewis and Watkins did not "act on the safety risk." (DE 1 ¶¶ 36-37.)

- **On February 12, 2016, Plaintiff was assaulted by an inmate.** Slaughter and Houston told the inmate "to go to his cell for a 'cooldown'." The prisoner was let out of his cell moments later. (DE 1 ¶ 41.) Slaughter and Houston did not write the inmate a misconduct ticket or put him in lockdown. Plaintiff suffered a head injury and began to experience migraine headaches, for which he sought treatment. (DE 1 ¶ 42; DE 1 at 12.) Plaintiff claims to have filed a grievance that same day but did not receive a response. (DE 1 ¶ 51, DE 1 at 21.)

- On February 16, 2016, Plaintiff informed Idemudia of the situation and requested protection; however, Idemudia did not take any action and, following more complaints about safety, Idemudia threatened retaliation. (DE 1 ¶ 38.)

- Plaintiff attempted to obtain protection from Slaughter and Houston, but they did not "act on the notification." (DE 1 ¶¶ 39-40.)

- To date, Plaintiff "now has to take Excedrin Migrain[e] medicine [as] prescribed after [the] attacks on him." (DE 1 ¶ 48.)

   2.   **Grievance Identifier MBP-2016-02-00363-17I (Submitted February 2016) appears to grieve several of the MBP Defendants.**

---

[5] Defendants mistakenly interpret this claim as alleging that Defendants Lewis and Lee placed *Plaintiff* in his cell. (*Compare* DE 1 ¶ 34, DE 20 at 7 ¶ 6.)

8

On or about February 9, 2016, *while incarcerated at WCC*, Plaintiff completed an MDOC Step I grievance form, which concerns a February 3, 2016 incident and, although difficult to read, appears to grieve several of the above-described *MBP Defendants*. (DE 1 at 16.) On March 2, 2016, (Nicholas) Calzetta and (Darrin) Viitala provided the Step I Grievance Response and summarized: "Prisoner Alexander never disclosed any information to staff at MBP about needing protective custody. Prisoner was transferred to [WCC] for mental health needs, no violations of policy have occurred." (DE 1 at 17.)

What happened at Step II is unclear, although Plaintiff does provide a Step II grievance appeal form which mentions several of the WCC defendants. (DE 1 at 18.) Nonetheless, Plaintiff's Step III grievance appeal was received on May 9, 2016 and denied on May 31, 2016. (DE 1 at 19-20.)

### 3. Plaintiff's safety claims against the MBP Defendants are not unrelated to those against the WCC Defendants.

Interpreting Plaintiff's complaint as alleging "ten distinct claims against eighteen individuals at two different prison facilities[,]" Defendants present the sole argument that Plaintiff's claims and Defendants "are improperly joined." (DE 20 at 5, 8-12.) Namely, Defendants claim, the "unrelated claims should be severed from this action." (DE 20 at 12.)

The Court disagrees. First, Plaintiff's own complaint makes clear that his claims against the 18 named defendants: **(a)** stem from the February 2015

9

misappropriation of Plaintiff's television, after which Plaintiff was allegedly labeled a "snitch," had a "hit" ordered on him, and was "targeted;" **(b)** continue through his January 2016 transfer from MBP to WCC; and **(c)** concern two attacks upon Plaintiff at WCC. (DE 1 ¶¶ 13-16, 31-33, 41.) Although Defendants interpret Plaintiff's initial factual allegations as alleging that "MDOC staff intentionally allowed" Plaintiff's property "to be stolen in retaliation" for his grievances and lawsuit (*see* DE 20 at 6 ¶ 1), the Court views these allegations as a backdrop for the allegation that Plaintiff had a hit placed on him – an allegation from which stem the safety claims at issue in the instant complaint, involving related treatment of these concerns at both facilities. This interpretation is affirmed by Plaintiff's complaint's allegation that "ALL Defendants are liable for the two attacks that Plaintiff encountered [while at WCC]," particularly Niemisto and Johnson. (DE 1 ¶ 43.) Consistently, within his "claims for relief," Plaintiff asserts, among other things, that:

- all Defendants were "personally aware of a *serious safety risk* and intentionally fail[ed]/refus[ed] to act on the *serious safety risk* . . . ."

- Calzetta, Govern, Giesen, Viitala and Salmi of MBP "refus[ed] to act on the *serious safety risk* . . . ."

- Huss, Niemisto and LaCount of MBP exhibited "intentional disregard" and alleges that they "refused to act."

- Idemudia of WCC threatened retaliation "if Plaintiff didn[']t stop complaining about his fear [for] his safety" and "continued to ignore *serious safety risk* which led to assault on Plaintiff."

- Slaughter of WCC "initially disregarded the *serious safety risk* because he didn[']t like how Plaintiff was 'complaining.'" (DE 1 ¶ 56.)

(DE 1 ¶¶ 52-56 (emphases added).) As is evident from these paragraphs, Plaintiff's claims against Defendants – whether associated with Plaintiff's imprisonment at MBP or WCC - are based upon an alleged and ongoing "serious safety risk."

Second, Plaintiff's response supports an interpretation of his complaint as alleging claims as "arising out of the same . . . series of transactions or occurrences[.]" Fed. R. Civ. P. 20(a)(2)(A). Specifically, he responds that all defendants "played a significant role in the two assaults that Plaintiff endured[.]" Moreover, with particular reference to the State Defendants' characterization of his claims, Plaintiff states that all of his claims "are related to all defend[a]nts who allowed for Plaintiff to be assaulted twice[,]" and "who failed to protect him[;]" in other words, he is not suing for property loss or denial of medical care. (DE 22 at 2, 7.) As Plaintiff explains, the hit placed upon him at MBP is "common" to his claims against each of the Defendants. (DE 22 at 3.) Then, referring to several of the factual allegations in his complaint, Plaintiff claims he "has . . . demonstrated the domino effect in which he went from MDOC employee to MDOC employee

notifying them of serious safety risk, only to be disregarded by them." (DE 22 at 3-7.) In Plaintiff's words, his claims for relief "revolve around Defend[a]nts disregarding serious safety risk[,]" which paved the trajectory to two assaults. (*Compare* DE 1 ¶¶ 52-56, DE 22 at 7.)[6]

Third, Defendants' reply does not effectively challenge the conclusion that Plaintiff's claims against the various MBP and WCC Defendants are related. For example, Defendants note that these institutions are "more than 400 miles apart . . . ." This assertion, even if true, is unavailing, given Plaintiff's allegation that he was transferred directly from MBP to WCC. Defendants also contend that "the MBP claims involved Alexander's placement within and transfer from the facility, whereas the WCC claims involved distinct incidents of where Alexander was attacked." (DE 23 at 2.) However, Plaintiff's sur-reply buttresses the conclusion that his claims against the MBP and WCC defendants are connected by the hit

---

[6] Additionally, Plaintiff points out that, on March 31, 2016, Executive Magistrate Judge Whalen entered an opinion and order denying Defendants' Motion to Sever Based on Misjoinder of Parties and Claims in *Alexander v. Hoffman et al,* Case No. 2:15-cv-10294-DML-RSW (E.D. Mich.). (DE 22 at 8.) This case involved a 47-page, 283-paragraph complaint against approximately 20 MDOC employees, most of whom were associated with Saginaw Correctional Facility and one of whom was associated with Chippewa Correctional Facility, to which Plaintiff was eventually transferred. In sum, the Court concluded that "[a]lthough the claims against each Defendant cover a range of alleged constitutional violations, they are all related to Plaintiff's claim of retaliation and conspiracy to retaliate for his having filed grievances." (Case 15-10294 (DE 63).)

allegedly placed upon him at MBP and the two assaults that allegedly occurred at WCC:

> . . . his claims and defendants are properly joined, and . . . Defendants are trying to have Plaintiff's claims severed solely because of economic and geographical reasons by virtue of upper pen[in]sula defend[a]nts being joined in the [E.D. Mich.]. . . . The assaults Plaintiff endured w[ere] due to <u>all</u> defend[a]nts' deliberate indiff[e]rence, and are all connected through a series of occur[e]nces."

(DE 24 at 1.) I agree that the claims and parties are properly joined. Moreover, judicial economy favors keeping these claims and parties together; if the Court were to grant severance, it appears that much of the evidence to be sifted, and many of the witnesses, would be common to both lawsuits.

### E.   Conclusion

Of course, none of the above analysis is a commentary on whether Plaintiff will succeed in his claims against the various MBP and WCC Defendants. That question will more likely be addressed via a Fed. R. Civ. P. 12 motion to dismiss or a Fed. R. Civ. P. Rule 56 motion for summary judgment. Still, Plaintiff is the master of his complaint, and, as such, he is entitled to characterize his claims, whether or not they will end up surviving dispositive motion practice. At this point - given Plaintiff's multiple assertions that his claims against Defendants stem from their disregard of his serious safety risk and the Supreme Court's direction that the joinder of claims, parties, and remedies is "strongly encouraged," *United Mine Workers of Am.*, 383 U.S. at 724 – the Court will deny the State Defendants'

motion to sever. Plaintiff is invited, but certainly not required, to consider whether all of the named Defendants are necessary to his success in this lawsuit, and whether the voluntary dismissal of one or more Defendants would make this case more manageable.[7]

## II. ORDER:

Accordingly, the State Defendants' motion to sever based on misjoinder of parties and claims (DE 20) is **DENIED**.

Dated: May 18, 2017

s/Anthony P. Patti
Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on May 18, 2017 electronically and/or by U.S. Mail.

s/Michael Williams
Case Manager for the
Honorable Anthony P. Patti

---

[7] This opinion has been issued by way of an order rather than a report and recommendation. As then-Magistrate Judge Michelson recognized, albeit in an unpublished case, "other courts have treated a motion to sever as non-dispositive." *Third Degree Films v. Does 1-36*, No. 11-cv-15200, 2012 WL 2522151, *1 n.1 (E.D. Mich. May 29, 2012) (citing cases).