UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

D'ANDRE ALEXANDER,

            Plaintiff

v.

NICHOLAS GALZETTA,
FRED GOVERN, ERICA
HUSS, DARRIN VIITALA,
MANDI SALMI, KENNETH
NIEMISTO, KRISTINE
GIESEN, TERRY MEDEN,
CHAD LaCOUNT, HANNA
SAAD, DR. ROSEN, C/O
WATKINS, C/O LEWIS, C/O
LEE, C/O SLAUGHTER, C/O
HOUSTON, DAPHNE M.
JOHNSON and RICHARD
IDEMUDIA

            Defendants.
_____/

Case No. 2:16-CV-13293
District Judge Mark A. Goldsmith
Magistrate Judge Anthony P. Patti

## REPORT AND RECOMMENDATION REGARDING STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DE 46) AND DR. TERRY MEDEN'S MOTION FOR SUMMARY JUDGMENT (DEs 53, 54)

**I.     RECOMMENDATION**:  The Court should grant in part and deny in part the State Defendants' motion for summary judgment (DE 46) and Defendant Terry Meden's motion for summary judgment. (DEs 53, 54).

## II.    REPORT

### A.    Background

#### 1.    Factual Background

Plaintiff D'Andre Alexander (#731077) is currently incarcerated at the Michigan Department of Corrections (MDOC) Gus Harrison Correctional Facility (ARF) in Adrian, Michigan.    *See* www.michigan.gov/corrections, "Offender Search."    On September 8, 2016, while incarcerated at the MDOC's Macomb Correctional Facility (MRF), Plaintiff filed the instant lawsuit against eighteen (18) defendants, who are described as follows:

- **nine (9) Defendants** are associated with the MDOC's Marquette Branch Prison (**MBP**) (Nicholas Calzetta, Fred Govern, Kristine Giesen, Darrin Viitala, Chad LaCount, Kenneth Niemisto, Erica Huss, Mandi Salmi and Terry Meden), which is located in Michigan's upper peninsula,

- **eight (8) Defendants** are associated with the MDOC's Woodland Center Correctional Facility (**WCC**) (Hanna Saad, Dr. Rosen, Melvin Watkins, John Lewis, Rodney Lee, Kyle Slaughter, Bobby Houston and Richard Idemudia), which is located in Whitmore Lake, Michigan, and

- **one (1) Defendant** is associated with the **MDOC's Office of Legal Affairs** (Daphne Johnson).

(DE 1 at ¶¶ 5-12.)[1]   The facts underlying his complaint span the period from February 2, 2015, when Plaintiff was incarcerated at MBP, through February 2016, when Plaintiff was incarcerated at WCC.  (DE 1 at ¶¶ 4, 13-48.)

> ### a.   Plaintiff's allegations regarding the eight  MBP State Defendants and Defendant Meden (February 2015 through January 2016)

According to Plaintiff's verified complaint, on February 2, 2015, he was involved in a fight and taken to segregation.  While he was in segregation, Plaintiff alleges that prison staff intentionally allowed his television to be stolen in retaliation for filing grievances and for filing a lawsuit less than two weeks earlier (Case No. 2:15-cv-10294-DML-RSW (E.D. Mich.)).   (DE 1 at ¶ 13.)   When Plaintiff was released from segregation and discovered who had his television, he notified an officer who went to retrieve it.  (*Id.* at ¶ 14.)  Plaintiff asserts that he was thereafter labeled a "snitch," a hit was ordered, and he was targeted.  (*Id.* at ¶ 15.)  Plaintiff claims he was threatened that "he would be stabbed and jumped by the gang members if he returned to [the] general population."  (*Id.* at ¶ 16.)

Plaintiff alleges that between May 6 and August 11, 2015, he separately informed Defendants Huss, Salmi, Govern, Giesen and LaCount of the safety risk

---

[1] As far as the Court can tell, Defendants Rosen and Saad have not yet been served and the Court is currently ascertaining the status of service with the U.S. Marshal Service.

and requested to be placed in MBP F-Block's ICP (Intermediate Care Program), and that each of these defendants failed to protect him by refusing to place him in MBP F-Block.  (DE 1 at ¶¶ 17-25.)  According to Plaintiff, F-block is "a secure unit where prisoners ha[v]e no direct opportunities to have physical contact with each other."  (*Id.* at ¶ 17.)  Specifically, Plaintiff alleges that on May 6, 2015, he met with Defendant Salmi, a Qualified Mental Health Professional (QMPH) and a case manager for mentally-ill prisoners, and informed her of the "situation" and requested to be moved to F-Block ICP, and that she "refused to report the safety need[,]" and did not "document the notification of the safety risk."  (*Id.* at ¶¶ 17-18.)  Defendant Salmi avers that she met with Plaintiff while he was housed in E-Block, but he was not eligible for placement in ICP at that time, and she denies that Plaintiff reported a safety risk.  (DE 46-3, at ¶¶ 3-4.)

On May 11, 2015, Plaintiff contends that he informed Defendant Govern, an Assistant Resident Unit Supervisor (ARUS), of the safety risk and requested protection; however, Govern responded "Grieve [it].  I don't care" and did not "act on the situation."  (DE 1 at ¶ 19.)  Governs responds that Plaintiff was housed in E-Block Base 14, classified as administrative segregation, at that time, denies that Plaintiff asked for protection, and denies he made the "grieve it" statement.  (DE 46-4 at ¶¶ 3-5.)

4

Plaintiff claims that on June 3, 2015, he informed Defendant Huss, a Deputy Warden, of the safety risk and requested protection while she was making rounds, but that she did not "attempt to report and[/]or intervene" regarding the safety risk. (DE 1 at ¶ 22.)  Huss states that she does not remember the conversation with Plaintiff while he was classified to administrative segregation, but that she likely informed Plaintiff that there would be no benefit to investigating his protection request because he was already segregated from all other prisoners, and that if he still wanted protection once he would be released to the general population, he should supply a written request for protection.  (DE 46-2 at ¶¶ 3-4.)

On June 16 and 17, 2015, Plaintiff contends he informed Defendant Giesen, also an ARUS, about the safety risk, "requested to be called out to talk more in depth" about it, and that he gave her a handwritten notice which requested protection.  (DE 1 at ¶¶ 20-21.)  He contends that Giesen stated on June 19, 2015, "Why should I help you?  All you do is write complaints on staff here."  (*Id.* at ¶ 21.) Giesen denies that Plaintiff, who was already in administrative segregation through August 11, 2015, asked for protective custody, but states that if he had, she would have immediately had his concerns investigated.  (DE 46-5 at ¶ 5.)

Plaintiff alleges that on June 18, 2015, Defendants Huss and LaCount, a prison counselor (PC), came to Plaintiff's cell, and Plaintiff told them about his need for protection, and that he also gave LaCount a written summary of the

5

situation, in which he requested protection, but that they did nothing.  (DE 1 at ¶ 23.)  LaCount denies that Plaintiff ever requested protection, verbally or in writing, and Huss does not recall the conversation.  (DEs 46-2 at ¶ 3; 46-6 at ¶ 3.)

Plaintiff contends that on July 6, 2015, Defendant Terry Meden, a psychiatrist, treated Plaintiff and offered to have him appealed out of segregation and sent to MBP's G-block, where there was a Secure Status Outpatient Treatment Program (SSOTP).  (DE 1 at ¶ 24.)  According to Plaintiff, he responded that he could not be placed in the general population, because of the altercation mentioned above, and asked to be placed in F-block, where there would be "no physical contact with prisoners."  (*Id.* at ¶ 25.)  Plaintiff states that Meden agreed and had Plaintiff "signed up for ICP placement in F-block."  (*Id.* at ¶ 26.)  Dr. Meden conducted a psychiatric evaluation of Plaintiff the next day, July 7, 2015, diagnosed Plaintiff with Brief Psychotic Disorder, Polysubstance Dependence, Antisocial Personality Disorder and history of noncompliance (DE 54-1 (SEALED)), and placed Plaintiff on a waitlist for transfer to an Interim Care Program (ICP).  (DE 53 at 2; DE 54-3 at 3 (SEALED).)

Plaintiff alleges that on July 16, 2015, Defendant Niemisto, an Inspector at MBP, offered to release Plaintiff from segregation, presumably to MBP's general population, and Plaintiff informed Niemisto of his safety concern and gave him a written account of the incident, but that Niemisto "did nothing to accom[mo]date

Plaintiff's protection needs." (DE 1 at ¶ 44). Niemisto stated that he attended Plaintiff's July 16, 2015 Security Classification Committee (SCC) interview but does not recall Plaintiff alerting him to a safety issue or protection request. (DE 46-7 at ¶ 3.) Niemisto explained that if Plaintiff or any other prisoner had brought safety concerns to him, he would have initiated the protective custody investigation process by completing a CSJ-686, "Request for Protection/Investigation Report," and that he has reviewed the relevant records and has been unable to find a protection custody investigation request for Plaintiff. (DE 46-7 at ¶ 4.)

Plaintiff was placed in the F-Block ICP from August 11, 2015 through December 24, 2015, when he was placed back in segregation due to a threatening behavior misconduct. (DE 1 at ¶ 27; DE 46-3 at ¶ 5.) Plaintiff was on suicide observation from December 24, 2015 to December 30, 2015, after which he was placed back into segregation. (DE 46-3 at ¶¶ 5-6.)

On January 22, 2016, Plaintiff asserts that Defendant Salmi offered to take him out of segregation and send him to MBP's G-Block, where there was an SSOTP, but that he declined, reiterated the "situation," and asked for protection/transfer. (DE 1 at ¶¶ 27-28.) Salmi stated that Plaintiff could not return to F-Block ICP because of the threatening behavior misconduct, and that he was referred to [WCC] Acute Care on January 26, 2016 for a higher level care, but that Plaintiff never informed her that he had a safety concern. (DE 46-3 at ¶ 6.)

7

On January 25, 2016, Plaintiff contends that Defendant Calzetta, a PC, asked him "to agree to leave segregation and go to 'G-Block[,]'" and that Plaintiff informed Calzetta of the safety risk and requested protection. (DE 1 at ¶ 29.) According to Plaintiff, Calzetta responded in part by revealing that he had been informed by Govern "how those guys want [Plaintiff's] head" and left. (*Id.*) Calzetta denies making the statement and denies that Plaintiff asked him for protection. (DE 46-8 at ¶¶ 3-4.)

Plaintiff also contends that "sometime in the beginning of January 2016," Defendant Viitala, a Resident Unit Manager (RUM), denied Plaintiff's request for protection due to "beefing with Govern." (*Id.*) Viitala denies these allegations. (DE 46-9 at ¶¶ 3-4.)

On January 26, 2016, Plaintiff treated with Dr. Meden, and Dr. Meden offered to have Plaintiff sent to WCC Acute Care. (DE 1 at ¶ 30; DE 54-2 (SEALED).) Plaintiff alleges that he responded that he was not comfortable with a transfer to WCC and reiterated his safety concern, and he contends that Dr. Meden "stated he would not have Plaintiff sent there." (DE 1 at ¶ 30.) However, according to Plaintiff's treatment note, while Plaintiff was initially resistant to transfer to WCC, "due to paranoia and unfamiliarity with that setting," Dr. Meden "was able to get [Plaintiff's] agreement with WCC placement." (DE 54-2 (SEALED).) On January 27, 2016, Plaintiff was informed that he was going to be

transferred to WCC.  Plaintiff claims that he let it be known that "he did not approve of the disregard of his safety risk."  (DE 1 at ¶ 31.)

### b.  Plaintiff's claims against six WCC State Defendants (January 2016 through February 2016)

Plaintiff alleges that at his first treatment team meeting after his transfer to WCC, he informed WCC staff present—Dr. Hanna Saad, QMHP Rosen, and Defendant Watkins, a Corrections Medical Officer (CMO)—about the hit placed on him and that he was in fear of his safety.  (DE 1 at ¶ 32.)  Watkins does not recall that meeting or Plaintiff's request.   (DE 46-10 at ¶ 3.)   According to Plaintiff, an inmate "subsequently" heard him talking to another prisoner about the hit on him, and that inmate then "announced himself as a member of the gang that put the hit on [Plaintiff] and then attacked [him]."  (DE 1 at ¶ 33.)  Plaintiff states that he did not defend himself and sustained a right ear injury, for which he sought treatment, and that Defendants Lewis and Lee, both CMOs, then "had the inmate placed in his cell."  (DE 1 at ¶ 34.)  Plaintiff asserts that he had alerted both Lewis and Lee of the "safety risk" and requested protection prior to the attack.  (*Id.*) Defendants Lewis and Lee do not recall a prisoner attacking Plaintiff on January 27, 2016, do not recall Plaintiff sustaining any injuries, and do not recall him requesting protection.  (DE 46-11 at ¶¶ 3-4; DE 46-12 at ¶¶ 3-5.)

Plaintiff alleges that he "subsequently" further expressed his safety concern to Defendants Saad, Rosen, Watkins, Lewis and Lee and requested protection, and

that they "refused to accommodate the safety need." (DE 1 at ¶¶ 35-37.) Plaintiff asserts Lewis stated "You from Detroit. Handle that s**t like a man" and that Lee did not act. (*Id.* at ¶¶ 36-37.) Defendant Lewis denies making this statement. (DE 46-11 at ¶ 4.)

Plaintiff claims that he was assaulted again on February 12, 2016, but by a different inmate, and that he suffered a head injury and began to experience migraine headaches, for which he sought treatment. (DE 1 at ¶¶ 41-42.) He states that Defendants Slaughter and Houston, both CMOs, told the inmate "to go to his cell for a 'cooldown'," but that the offending inmate was let out of his cell moments later. (*Id.* at ¶ 41.) Plaintiff claims that Slaughter and Houston did not write the inmate a misconduct ticket or put him in lockdown. (*Id.* at ¶ 42.) Plaintiff also claims that he attempted to obtain protection from Slaughter and Houston, but both refused to act. (DE 1 at ¶¶ 39-40.) Neither Slaughter nor Houston remember witnessing Plaintiff being assaulted (but Slaughter does remember a "yelling incident between [Plaintiff] and another prisoner") and both state that he did not ask them for protection. (DE 46-14 at ¶¶ 3-18; DE 46-15 at ¶¶ 3-10.)

On February 16, 2016, Plaintiff states that he informed Defendant Idemudia, an Assistant Resident Unit Officer (ARUO), of the "situation" and requested protection; however, Idemudia did not take any action and, following more

complaints about safety, Idemudia threatened retaliation.   (DE 1 at ¶ 38.)
Idemudia denies these allegations.  (DE 46-13 at ¶¶ 3-7.)  Plaintiff alleges that to
date, he "now has to take Excedrin Migrain[e] medicine [as] prescribed after [the]
attacks on him."  (DE 1 at ¶ 48.)

### c.      Plaintiff's claims against Daphne Johnson

Plaintiff alleges that in July 2015, he drafted a request for a declaratory
ruling, which was sent to the Director's office sometime in August or September.
(DE 1 at ¶ 45; DE 46-16 at 12-15.)  In that letter, Plaintiff complained that he was
being held in segregation "unreasonably as retaliation for [] filing grievances and
[a] lawsuit," and he requested a "declaratory ruling, stating that staff, once aware
of a safety risk, are to transfer [him] as soon as possible[.]"  (DE 46-16 at 14.)
Defendant Johnson, the Administrator of MDOC's Office of Legal Affairs, avers
that she responded to three requests for a declaratory ruling from Plaintiff between
August 21, 2015 and February 1, 2016, but that she was not personally involved in
any decisions regarding Plaintiff's placement within MDOC facilities.  (DE 46-16
at ¶¶ 4-5.)  In her August 21, 2015 letter, Johnson acknowledged Plaintiff's
complaints and his request for a ruling directing his transfer to another facility as
soon as possible.  (DE 46-16 at 11.)  However, she explained in her letter that
Plaintiff's security classification and placement is a decision made by the facility's

Security Classification Committee (SCC), and that the SCC decision may only be grieved through the Department's grievance process.  (DE 1 at 13.)

### 2.    The Instant Motions

There are two summary judgment motions pending in this matter: (1) the State Defendants' June 27, 2017 motion for summary judgment (DE 46)[2]; and (2) Defendant Terry Meden's July 11, 2017 motion for summary judgement.  (DEs 53, 54 (SEALED).)  Plaintiff provided verified responses to both motions on January 23, 2018, and supported his responses with sworn declarations.  (DEs 84, 85, 86-2 and 88-1.)  Unfortunately, despite being given time in which to do so, neither the State Defendants nor Defendant Meden filed a reply brief.

### B.    Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts

---

[2] Defendants' motion identifies the "State Defendants" as Defendants Nicholas Calzetta, Fred Govern, Erica Huss, Darrin Viitala, Mandi Salmi, Kenneth Niemisto, Kristine Giesen, Chad LaCount, Melvin Watkins, John Lewis, Rodney Lee, Kyle Slaughter, Bobby Houston, Daphne Johnson, and Richard Idemudia. (DE 46 at 2.)

in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion."). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . .  [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted).

Summary judgment is appropriate if the evidence favoring the nonmoving party is merely colorable or is not significantly probative.  *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994).  In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ."  *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

### C.    Discussion

#### 1.    Exhaustion of Plaintiff's Administrative Remedies

##### a.    Exhaustion under the PLRA

Under the PLRA, a prisoner may not bring an action "with respect to prison conditions under section 1983 of this title, or any other Federal law . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Congress enacted this provision to address the "outsized share" of prisoner litigation filings and to ensure that "the flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit." *Jones*, 549 U.S. at 203.  Put another way, the purpose of § 1997e(a) is to "reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  In addition, exhaustion "gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is

14

haled into federal court, and it discourages disregard of [the agency's] procedures."
*Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (internal quotation marks and citations omitted).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought into court." *Jones*, 549 U.S. at 211. The prison's grievance process determines when a prisoner has properly exhausted his or her claim. *Id.* at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."). Even where a prisoner has made some attempts to go through the prison's grievance process, "[t]he plain language of the statute makes exhaustion a precondition to filing an action in federal court." *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999). The prisoner "may not exhaust his [or her] administrative remedies during the pendency of the federal suit." *Id.* (citations omitted); *see also Woodford*, 548 U.S. at 95 ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . ."). However, "the PLRA and Federal Rule of Civil Procedure 15 permit a plaintiff to amend his complaint and add claims that were exhausted after the commencement of the lawsuit, provided that the plaintiff's original complaint contained at least one

15

fully exhausted claim." *Mattox v. Edelman*, 851 F.3d 583, 595 (6th Cir. 2017).

Moreover, "inmates are not required to specially plead or demonstrate exhaustion

in their complaints." *Jones*, 549 U.S. at 216.  Instead, failure to exhaust

administrative remedies is an affirmative defense under the PLRA.  As such,

Defendants bear the burden of proof on exhaustion.  *Surles v. Andison*, 678 F.3d

452, 456 (6th Cir. 2012) ("A PLRA defendant bears the burden of proving that a

PLRA plaintiff has not exhausted his administrative remedies.").

### b.    Grievance Procedures at the MDOC

Pursuant to its Policy Directive 03.02.130, dated July, 9, 2007, the

administrative remedies available at the MDOC are as follows.  First, the inmate

must attempt to resolve any issue with the staff member involved within two

business days of becoming aware of a grievable issue.  (DE 16-2, ¶P.)  If the issues

are not resolved within five business days, the inmate may file a Step I grievance

using the appropriate form.  (*Id.*)  "Dates, times, places, and names of all those

involved in the issue being grieved are to be included." (*Id.* at ¶R.)  The inmate

should receive a response within fifteen business days of filing the grievance.  (*Id.*

at ¶X.)

If the inmate is dissatisfied with the disposition of the grievance, or does not

receive a response by ten business days after the due date, he or she may file a Step

II grievance using the appropriate form.  (*Id.* at ¶ BB.)  As with Step I, a response

to the Step II grievance should be issued within fifteen business days.  (*Id.* at ¶ CC.)

Similarly, if the inmate is dissatisfied with the Step II response or does not receive a response by ten business days after the response was due, he or she may file a Step III grievance.  (*Id.* at ¶ FF.)  The matter is fully exhausted after the disposition of the Step III grievance.  *Surles*, 678 F.3d at 455 ("A grievant must undertake all steps of the MDOC process for his grievance to be considered fully exhausted.").

> **c.**   **Plaintiff has partially exhausted his administrative remedies as to his claims against certain State Defendants and has exhausted his administrative remedies as to his failure to protect claim against Defendant Meden**

The State Defendants argue that Plaintiff failed to exhaust his administrative remedies.  First, they argue that Plaintiff did not pursue *any* grievances relating to his allegations against the WCC State Defendants (Watkins, Lewis, Lee, Slaughter, Houston and Idemudia) to Step III and thus has failed to exhaust his administrative remedies as to those defendants.  (DE 46 at 26; DE 46-18.)  Second, they argue that although Plaintiff filed a grievance against the MBP State Defendants (Calzetta, Govern, Giesen, Viitala, LaCount, Niemisto, Huss and Salmi) relating to his protection concerns surrounding his January 27, 2016 transfer to WCC (Grievance MBP-16-02-0363-17i), the Step I grievance was filed *after* Plaintiff

transferred from MBP and concerned only Plaintiff's placement in the general population at MBP, and thus would have been moot as he had already transferred to WCC.  (*Id.*)  The State Defendants further argue that Plaintiff never pursued the grievance of any SCC decisions at MBP or WCC.  Finally, the State Defendants argue that to the extent any administrative remedies lie in Defendant Johnson's declaratory rulings, any remedy would require the appeal of the rulings, which Plaintiff did not do.

Defendant Meden argues that Plaintiff has failed to exhaust his administrative remedies against him because his grievance (Grievance MBP-16-02-0363-17i) was untimely.  Meden explains that the grieved incident concerned the transfer of Plaintiff to WCC, which he says occurred on January 26 or 27, 2016, rather than the alleged February 3rd attack, so Plaintiff should have filed his grievance at the latest by February 5, 2016, but he did not file the grievance until February 9, 2016.  (DE 53 at 17-18.)

Plaintiff responds that he timely exhausted his available administrative remedies "by writing a Step 1 grievance naming [MBP State Defendants and Defendant Meden] as being deliberately indifferent to his serious safety risk resulting to [sic] an assault that occurred on or about 2/3/2016 at the Woodland Correctional Facility."  (DE 84 at 9 (emphasis in original), citing DE 88 at 3; *see also* DE 85 at 7, citing DE 86-1 at 2.)  Plaintiff contends that because the grievance

18

coordinator refused to send a Step II appeal form, he used an old appeal form with a different grievance identifier number on it in order to meet his appeal deadline. He asserts that at that time he added the failure to protect claims against the WCC State Defendants regarding the second assault at WCC by naming Saad, Rosen, Watkins, Lewis, Lee and Idemudia, and "other John and Jane Does," in his Step II appeal of that grievance. (DE 84 at 9-10, 13 citing DE 88 at 15.)[3] Plaintiff asserts that he received the Step II appeal back on May 2, 2016, and it was "unprocessed" with a note that said "wrong grievance." (DE 84 at 10.) Plaintiff asserts that, in exercising his due diligence and attempting to exhaust his administrative remedies, he appealed this grievance through Step III. The Step III appeal was not rejected on a procedural basis, but states that it was "reviewed and considered," and thus Plaintiff asserts he exhausted his administrative remedies against both the MBP and the WCC State Defendants, as well as Defendant Meden. (DE 84 at 11, citing DE 88 at 23; DE 85 at 8-9, citing DE 86-1 at 15.)

Plaintiff further asserts that, "[a]s a diligent grievant," he filed a separate grievance at WCC on February 12, 2016, "just days after the first one [filed at MBP on February 9, 2016]," again naming both MBP and WCC State Defendants,

---

[3] Plaintiff states that he added the WCC State Defendants to this grievance instead of filing a new one because the grievance coordinator (Glen Caron) had a "procedure and practice" of routinely rejecting Step I grievances that grieved issues related to already filed Step I grievances and instead directing Plaintiff to "go to Step II with the new issues." (DE 84 at 10.)

and "John/Jane Does."  He claims, however, that he never received a response nor a receipt with a grievance identifier number for this grievance, and that he therefore could not appeal the grievance.  (DE 84 at 13-14, citing DE 88 at 25.) Plaintiff asserts there is a question of fact as to whether the grievance process was reasonably available to him, and that this grievance should be deemed exhausted because of "interference of Plaintiff's attempt to exhaust renders the remedy unavailable." (*Id.*)

Finally, Plaintiff claims that he filed a grievance against Defendant Johnson on August 27, 2015 "right after he received a response from her," addressing "her deliberate indifference to his serious safety need."  (DE 84 at 14; DE 40 at ¶ 2.) He claims that, as above, he did not receive a response nor receipt with an identifier number necessary to appeal that grievance.  He further alleges that on December 21, 2015 that grievance was confiscated along with his legal papers, and thus he cannot produce the copy of the grievance.  (DE 84 at 14-15; DE 40 at ¶ 3.)

### i. Grievance Identifier MBP-16-02-0363-17i (Submitted February 2016) exhausts Plaintiff's failure to protect claims as to the MBP State Defendants and Defendant Meden regarding his January 27, 2016 transfer to WCC

On or about February 9, 2016, *while incarcerated at WCC*, Plaintiff completed an MDOC Step I grievance form, which states that it concerned a February 3, 2016 incident and grieves the MBP State Defendants and Defendant

20

Meden. (DE 46-18 at 25; DE 88 at 3.) The grievance states that "[t]he issue is that [Plaintiff] was transferred without [his] consent or consideration of a known safety risk in which the above individuals knew of[,] [sic]" that he was subsequently assaulted at WCC, and that the assault would not have happened if Policy Directive PD 05.01.140, Prisoner Placement and Transfer, was followed. (*Id.*) On March 2, 2016, Defendants Calzetta and Viitala provided the Step I Grievance Response and summarized: "Prisoner Alexander never disclosed any information to staff at MBP about needing protective custody. Prisoner was transferred to [WCC] for mental health needs, no violations of policy have occurred." (DE 46-18 a 26; DE 88 at 4.) When Plaintiff did not receive a Step II Appeal form, he states that he used an old appeal form with a different identifier number on April 3, 2016, in order to meet his appeal deadline, and he claims he added the failure to protect claims against the WCC State Defendants regarding the second assault at WCC by naming certain WCC State Defendants, including "John and Jane Does," in his Step II appeal of that grievance. (DE 84 at 9-10, 13 citing DE 88 at 15.) Plaintiff asserts that he received the Step II appeal back on May 2, 2016 and it was "unprocessed" with a note that said "wrong grievance." (DE 84 at 10.) Plaintiff asserts that, in exercising his due diligence and attempting to exhaust his administrative remedies, he filed his Step III grievance appeal on May 4, 2016. (DE 46-18 at 24; DE 88 at 21.) However, he did not again name those WCC

Defendants in his Step III appeal. (See DE 88 at 21.) The Step III appeal was received on May 9, 2016, stated that it had been "reviewed and considered," and then denied on May 31, 2016. (DE 46-18 at 23; DE 88 at 23.)

Accordingly, Grievance MBP-16-02-0363-17i has been exhausted as to Plaintiff's failure to protect claims against the MBP State Defendants and Defendant Meden regarding his January 27, 2016 transfer to WCC because it was considered on its merits. *Surles*, 678 F.3d at 455 ("A grievant must undertake all steps of the MDOC process for his grievance to be considered fully exhausted."); *see also Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010) ("[T]he State's decision to review a claim on the merits gives us a warrant to do so as well, even when a procedural default might otherwise have resolved a claim."). Contrary to Defendant Meden's argument, the grievance was not denied as untimely, or on some other procedural basis.

> ii.     **Grievance Identifier MBP-16-02-0363-17i (Submitted February 2016) does not exhaust Plaintiff's retaliation claims alleged against the MBP State Defendants, and his declaratory relief claims against those defendants are moot**

In contrast, although this issue was not fleshed out in the State Defendants' motion for summary judgment, I find that Grievance MBP-16-02-0363-17i does not exhaust Plaintiff's retaliation claims alleged against the MBP State Defendants. A retaliation claim was not alleged or even mentioned in that grievance, and thus

22

that claim was never exhausted. *See Maybin v. Wade*, No. 09-13755, 2013 WL 5178281, at *4 (E.D. Mich. Sept. 12, 2013) ("Plaintiff's January 25th grievance does not allege or mention retaliation. Therefore, Plaintiff has not properly exhausted his administrative remedies and his Complaint must be dismissed.") (citing *Rickman v. Tantchou*, No. 11-CV-13079, 2012 WL 1229943, at *5 (E.D. Mich. Mar. 7, 2012) (retaliation claim not exhausted where grievance did not "assert that Plaintiff had been a victim of retaliation"); *Siler v. Baldwin*, No. 08-15077, 2011 WL 6371012, at *3 (E.D. Mich. Dec. 20, 2011) (retaliation claim dismissed where "Plaintiff's only administrative grievance did not mention the retaliation claim against" defendant)).

Further, Plaintiff's claims against the MBP State Defendants and Defendant Meden for declaratory relief should be dismissed as moot because he is no longer confined there. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) ("[T]o the extent [Plaintiff] seeks declaratory and injunctive relief his claims are now moot as he is no longer confined to the institution" that committed the violation); *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (explaining that the court below was correct in its conclusion that the issue of declaratory and injunctive relief became moot when the plaintiff left the facility). *See also Price v. Caruso*, 451 F.Supp.2d 889, 894 (E.D. Mich. 2006) (finding the plaintiff's claims for declaratory and

injunctive relief moot because Plaintiff is no longer incarcerated where the cause of action arose).

### iii. Grievance Identifier MBP-16-02-0363-17i (Submitted February 2016) does not exhaust Plaintiff's administrative remedies against the WCC State Defendants

Moreover, I find that Grievance MBP-16-02-0363-17i does not operate to exhaust Plaintiff's administrative remedies as to the WCC State Defendants. Although Plaintiff states that he added the names of certain WCC Defendants to his Step 2 appeal in Grievance MBP-16-02-0363-17i dated April 3, 2016 (but interestingly not in his Step 3 appeal dated May 4, 2016, although it is also submitted on a form with a different grievance identifier number), an appeal to one facility (here, the MBP) cannot operate to exhaust Plaintiff's administrative remedies as to employees of a completely different facility. As explained *supra*, one of the primary purposes of the exhaustion requirement is to "affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *See Woodford*, 548 U.S. at 90 (noting that exhaustion serves a dual purpose: it gives prisoners "an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors."); *see also Doe v. Mich. Dep't of Corrs.*, No. 13-14356, 2016 WL 465496, at *4 (E.D. Mich. Feb. 8, 2016) ("Proper exhaustion allows the prison a full and fair opportunity to address

24

complaints by requiring the prisoner to escalate the matter to such a level and in such a manner as to allow decisionmakers the chance to respond."). Escalating this matter at MBP would not serve the purpose of providing officials at WCC a "full and fair opportunity to address complaints" regarding the people employed at their site, and thus would thwart the purpose of exhaustion as to complaints against those individuals. Further, the WCC State Defendants were not responsible for Plaintiff's "transfer[] without [his] consent or consideration of a known safety risk," as stated as the issue being grieved in Grievance MBP-16-02-0363-17i, and those WCC State Defendants were not listed in Plaintiff's appeal of the grievance to Step III.  (See DE 46-18 at 24.)  Accordingly, Grievance MBP-16-02-0363-17i does not operate to exhaust Plaintiff's failure to protect claims against the WCC State Defendants.

### iv.    "WCC Grievance" (Submitted February 12, 2016)

Plaintiff asserts that he filed a grievance at WCC on February 12, 2016, after he alleges that he had been attacked a second time at WCC, and just three days after he filed Grievance MBP-16-02-0363-17i at MBP.  Although the grievance provided by Plaintiff as an exhibit is difficult to read, it appears to name the MBP State Defendants, certain WCC State Defendants, and "other John/Jane Does." (DE 84 at 13-14, citing DE 88 at 25.)  Plaintiff states that he never received a

response nor a receipt with an identifier number to this Step I grievance, and thus he could not appeal the grievance. (*Id.*)

Plaintiff argues that courts have held that in circumstances like this, a question of fact exists as to whether the grievance process was reasonably available to the prisoner. (See DE 84 at 14, citing *Doe v. Anderson*, No. 15-13852, 2017 WL 1209102, at *9 (E.D. Mich. Mar. 31, 2017); *Johnson v. Alexander*, No. 2:12-cv-429, 2014 WL 1276575, at *2 (W.D. Mich. Mar. 27, 2014).) In *Alexander v. Govern*, No. 2:16-cv-166, 2017 WL 2179865 (W.D. Mich. May 18, 2017), Plaintiff similarly argued that he never received a receipt for two Step I grievances and as a result he was not able to file a Step II grievance appeal forms identifying the Step I grievances. *Id.* at * 1. The Court found that a fact question existed as to whether Plaintiff exhausted available remedies regarding those grievances, and remanded the matter for an evidentiary hearing for a determination as to exhaustion. *Id.* The Court noted that "[q]uestions of fact regarding exhaustion under the Prison Litigation Reform Act are to be determined by the court and not the jury." *Id.* (citing *Travis v. Morgridge*, No. 1:12-CV-96, 2013 WL 227665, at *5 (W.D. Mich. Jan. 22, 2013); *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015) ("[D]isputed issues of fact regarding exhaustion under the PLRA present[] a matter of judicial administration that could be decided in a bench trial.")). The Sixth Circuit explained in *Surles v. Andison*, 678 F.3d 452, 457 n.10 (6th Cir. 2012), that

26

"if the plaintiff contends that he was prevented from exhausting his remedies [the defendant] must … present evidence showing that the plaintiff's ability to exhaust was not hindered."  Because the State Defendants did not file a reply brief and have not otherwise irrefutably addressed this argument, I find that Plaintiff has raised a question of fact as to whether this grievance has been exhausted as to his claims against WCC-based employees.  Therefore, summary judgment on the claims against the WCC State Defendants is denied at this time, because there is a question of fact concerning whether Plaintiff was reasonably capable of exhausting this grievance.  *See Doe*, 2017 WL 1209102, at *9.  Rather, the Court should conduct a bench trial (or an evidentiary hearing immediately preceding the jury trial) to determine whether these claims have been exhausted.  *See Alexander*, 2017 WL 2179865, at *1.  However, just as his grievance concerning events which took place at MBP could not operate to exhaust Plaintiff's administrative remedies as to those who work at WCC, his grievance concerning events which took place at WCC cannot exhaust his administrative remedies as to those employed at MBP.  Nor should MBP-based employees be held responsible for an alleged failure to protect Plaintiff when he was already in custody at another facility.

### v.    Daphne Johnson

The State Defendants contend that "to the extent any administrative remedies lie in State Defendant Johnson's declaratory rulings, any remedy would

27

require the appeal of the rulings, which Alexander did not do." (DE 46 at 26-27.)
Defendant Johnson responded to Plaintiff's request for a declaratory ruling under
MCL 24.263, which provides that "[a] ruling is subject to judicial review in the
same manner as an agency final decision or order in a contested case." MCL
24.263. It is undisputed that Plaintiff did not appeal this ruling.

Plaintiff asserts that he filed a grievance "solely on Defendant Daphne M.
Johnson on time right after he received a response from her" purportedly
"address[ing] her deliberate indifference to his serious safety need." (DE 84 at 14.)
Plaintiff contends, as above, that he "never received a response nor receipt with an
identifier number necessary to appeal the non-response," and provides a
declaration in support. (*Id.*, citing DE 40, Plaintiff's Declaration) Plaintiff avers
that on December 21, 2015, his legal papers, including this grievance regarding
Defendant Johnson, were "confiscated" in a "retaliatory cell search" and that he
therefore cannot produce a copy of the grievance. (DE 40 at ¶ 4.)

It is not at all clear that Plaintiff was required to exhaust administrative
remedies through the MDOC grievance policy as to Defendant Johnson's
declaratory ruling. In any event, because it is evident, as discussed below, that
Defendant Johnson was not personally involved in Plaintiff's allegations regarding
his transfer to WCC, Plaintiff's claims against Defendant Johnson should be
**DISMISSED**.

28

### vi.    Summary

Therefore, in sum, I find that Plaintiff has exhausted his failure to protect claims against the MBP Defendants and Defendant Meden related to the issue of Plaintiff's transfer to WCC on January 27, 2016, without "his consent or consideration of a known risk."  Plaintiff's claims for declaratory relief against the MBP State Defendants and Defendant Meden should be dismissed as moot. Plaintiff has failed to exhaust his <u>retaliation</u> claims against the MBP Defendants and those claims should be dismissed without prejudice.  There remains a question of fact as to whether Plaintiff has exhausted his failure to protect claims against the WCC State Defendants with regard to the alleged attack on Plaintiff on February 12, 2016, despite the alleged known safety risk and Plaintiff's alleged requests for protection. Accordingly, there should be a bench trial/evidentiary hearing to address this issue.

### 2.    Plaintiff Failed to Establish Defendant Johnson's Personal Involvement

The State Defendants argue that Defendant Johnson was not involved in any alleged unconstitutional behavior, but instead only responded to Plaintiff's requests for declaratory rulings.  (DE 46 at 28-30.)  Plaintiff argues in response that Defendant Johnson was personally involved because she received his request for a declaratory ruling and "failed to act."  (DE 84 at 16-18.)

To establish a viable claim under § 1983 a plaintiff must establish that he or she was deprived of a right "secured by the Constitution and the laws of the United States by one acting under color of law." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-56 (1978)). "[E]ach defendant's liability must be assessed individually based on his [or her] own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). A party cannot be held liable under § 1983 absent a showing that the party personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the alleged unconstitutional conduct. *See, e.g., Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989); *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir. 1982). In addition, bringing the problem to the attention of a supervisory official is not sufficient to impose liability. *See Shelly v. Johnson*, 684 F.Supp. 941, 946 (W.D. Mich. 1987), *aff'd*, 891 F.2d at 1246. Where a defendant's only role in an action "involve[s] the denial of an administrative grievance or the failure to act … [he or she] cannot be held liable under § 1983." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Smith v. Heyns*, No. 2:14-11601, 2014 WL 2743415, at *3 (E.D. Mich. June 17, 2014) ("The mere denial of a prisoner's grievance states no claim of constitutional dimension.") (quoting *Alder v. Corr. Med. Servs.*, 73 F. App'x 839, 841 (6th Cir. 2003)).

30

Here, Plaintiff has not established that Defendant Johnson was personally involved in any alleged unconstitutional behavior, and she has demonstrated that she was not personally involved in any decision regarding Plaintiff's placement within MDOC facilities.  (DE 46-16 at ¶¶ 3-5.)  "[A] mere failure to act," as alleged by Plaintiff, cannot impose liability under § 1983.  *Shehee*, 199 F.3d at 300 (holding that prisoner's claims against defendants whose only involvement was the denial of administrative remedies failed as a matter of law.).  Accordingly, Plaintiff's claims against Defendant Daphne Johnson should be **DISMISSED** for lack of personal involvement.

### 3.    Eleventh Amendment Immunity

The State Defendants argue that Plaintiff cannot bring a § 1983 claim against them in their official capacities.  (DE 46 at 41-42.)  Plaintiff asserts that he only sued eight of the eighteen Defendants in both their individual and official capacities.  According to Plaintiff's complaint, he has sued the following MBP State Defendants in their individual and official capacities:  Calzetta, Govern, Giesen, Viitala, LaCount, Niemisto, Huss, and Johnson.  (DE 1 at ¶¶ 5-12.)

To the extent Plaintiff sues these eight Defendants in their official capacities for money damages, those claims are barred by the Eleventh Amendment.  Where a plaintiff sues a defendant in his or her official capacity, it "is not a suit against the official but rather is a suit against the official's office."  *Will v. Michigan Dep't*

*of State Police*, 491 U.S. 58, 71 (1989).  Plaintiff's claims against Defendants

Calzetta, Govern, Giesen, Viitala, LaCount, Niemisto, Huss, and Johnson in their

official capacities, therefore, are claims against the State of Michigan, and "the

Eleventh Amendment bars a damages action against a State in federal court."

*Kentucky v. Graham*, 473 U.S. 159, 169 (1985).  Put another way, "[t]his bar

remains in effect when State officials are sued for damages in their official

capacity."  *Id.* at 169 (internal citation omitted).  Thus, the Eleventh Amendment is

a bar to Plaintiff's claim for money damages against Defendants Calzetta, Govern,

Giesen, Viitala, LaCount, Niemisto, Huss, and Johnson in their official capacity,

and these official capacity claims should be **DISMISSED**.  Although Plaintiff

asserts in his response that he seeks to recover injunctive relief from these

Defendants, his complaint fails to assert a claim for injunctive relief.  (See DE 1 at

11 (Section VIII. Prayer for Relief).)  And, as discussed above, Plaintiff's claims

for declaratory relief against these defendants should be denied as moot, as

Plaintiff is no longer housed at MBP.

### 4.     Plaintiff's Eighth Amendment Failure to Protect Claims

Plaintiff claims that the MBP State Defendants and Defendant Meden failed

to protect him in violation of the Eighth Amendment.  (DE 46 at 32-37; DE 53 at

25-27.)  Reading Plaintiff's complaint liberally, he seems to allege that certain

defendants violated his Eighth Amendment rights by transferring him to another

32

prison where an inmate(s) assaulted him.  Although he makes numerous allegations regarding many of the MBP State Defendants' alleged failures to protect him between February and December 2015, it is undisputed that he did not grieve those alleged denials of protection, and thus those claims are not exhausted. Moreover, no harm came to him while he was housed at MBP during that time period.  Indeed, he was either housed in segregation or in his desired placement on F-Block's ICP during that time period.  Thus, he suffered no physical injury as a result of the claimed denials of protection and he cannot recover on a claim based on those denials.  *See Spencer v. Michigan Dep't of Corrs.*, No. 2:14-CV-11343, 2015 WL 1439696, at *6 (E.D. Mich. Jan. 23, 2015) (citing 42 U.S.C. § 1997e(e) ("No federal civil action may be brought by a prisoner … for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act….")), *adopted in part and rejected in part on other grounds*, 2015 WL 1439617 (E.D. Mich. Mar. 27, 2015).

The only claim Plaintiff has exhausted against the MBP State Defendants and Defendant Meden is his claim regarding his January 27, 2016 transfer from MBP to WCC.  Reading Plaintiff's complaint liberally, the <u>only</u> defendants Plaintiff alleges were involved with his housing or placement around the time of his January 27, 2016 transfer from MBP to WCC are:

(1) **Defendant Salmi** ("offered to have Plaintiff appealed out of segregation and sent to MBP's 'G-block' where they, again, had the SSOPT program" on January 22, 2016; Plaintiff claims he reiterated his request for "protection/transfer");

(2) **Defendant Calzetta** ("asked [Plaintiff] to agree to leave segregation and go to 'G-block'" on January 25, 2016; Plaintiff requested protection and alleges Calzetta laughed and stated "Your [sic] a coward.  Govern told me about how those guys want your head" and left);

(3) **Defendant Viitala** ("Sometime in the beginning of January 2016, Plaintiff reported the safety risk to" Viitala "and requested protection;" Plaintiff alleges Viitala replied "Your beefing with Govern" and walked away); and,

(4) **Defendant Meden** ("offered to have Plaintiff sent to the" WCC on January 26, 2016, and informed him he was "about to be transferred to the WCC" on January 27, 2016; "Plaintiff complained about this decision and promulgated the fact that he did not approve of the disregard of his safety risk" and Meden did not report/intervene). (DE 88-1 at ¶¶ 16-21.)  Accordingly, Plaintiff's Eighth Amendment failure to protect claims against the remaining MBP State Defendants—Govern, Giesen, LaCount, Niemisto and Huss—should be **DISMISSED** for failure to allege personal involvement in the alleged unconstitutional conduct – transferring Plaintiff "without [his] consent or

34

consideration of a known safety risk." *See, Leach*, 891 F.2d at 1246 (a party

cannot be held liable under § 1983 absent a showing that the party personally

participated in, or otherwise authorized, approved or knowingly acquiesced in, the

alleged unconstitutional conduct).

As to Defendants Salmi, Calzetta, Viitala and Meden, under the Eighth

Amendment, "prison officials must ensure that inmates receive adequate food

clothing, shelter and medical care, and must 'take reasonable measures to

guarantee the safety of the inmates.'" *See Farmer v. Brennan*, 511 U.S. 825, 832

(1994); *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984) (prison staff are obliged

"to take reasonable measures to guarantee the safety of the inmates" in their care).

To establish a violation of this right, Plaintiff must show that Defendants were

deliberately indifferent to his risk of harm. *Walker v. Norris*, 917 F.2d 1449, 1453

(6th Cir. 1990). "Deliberate indifference" in medical treatment, prison conditions,

and failure to protect claims means that the official actually knew of 'a substantial

risk of serious harm and disregard[ed] that risk by failing to take reasonable

measures to abate it." *Farmer*, 511 U.S. at 847.

Under this standard, a prison inmate first must show that the failure to

protect from risk of harm is "sufficiently serious." *Bishop v. Hackel*, 636 F.3d 757,

766 (6th Cir. 2011) (quoting *Farmer*, 511 U.S. at 833). That is, the inmate must

show that "he is incarcerated under conditions posing a substantial risk of serious

harm." *Id.* Next, the inmate must show that the prison official was deliberately indifferent—that is, that the prison official knew of and disregarded an excessive risk to the inmate's health or safety; the official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and he must actually "draw the inference." *Id.* (quoting *Farmer*, 511 U.S. at 837). On the continuum of conduct, deliberate indifference is something greater than mere negligence and less than purposeful or knowing conduct—it is the "equivalent of recklessly disregarding" a serious risk of harm to the prisoner. *Farmer*, 511 U.S. at 836. The test is a subjective one which requires proof that the prison official "acted or failed to act despite [his or her] knowledge of a substantial risk of serious harm." *Id.* at 842. Deliberate indifference is not a "should have known" standard. *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003) ("It is insufficient for a plaintiff to allege that there existed a danger that an officer should have been aware of."). However, generally, an isolated or occasional attack is insufficient to state an Eighth Amendment claim. *See Stewart v. Love*, 696 F.2d 43, 44 (6th Cir. 1982), *modified on other grounds*, *McGhee v. Fotlz*, 852 F.2d 876 (6th Cir. 1988).

The State Defendants and Dr. Meden argue that Plaintiff has failed to demonstrate that he faced an objectively serious risk of harm at MBP. (DE 46 at

35-36; DE 53 at 26-27.)[4]  The MBP Defendants contend that Plaintiff was in

segregation from late April to mid-July 2015 and did not need protection at that

time, and that he has failed to produce any contemporaneous grievances, kites, or

other evidence to establish that he faced a substantial risk of serious harm, and

explain that Plaintiff in fact was never attacked at MBP.  (DE 46 at 35-36.)

However, Plaintiff does allege that Defendants were responsible for his transfer to

WCC, despite his requests for protection, and that he was attacked twice at WCC

shortly after his transfer there by member(s) of the gang that allegedly ordered the

"hit" on him for being a "snitch."  Thus, it appears, viewing the evidence in the

light most favorable to Plaintiff, that the objective prong of the failure to protect

claim—i.e., whether the risk of harm was sufficiently serious—has been met.

Turning to the subjective component, the operative inquiry is whether these

defendants knew that Plaintiff faced a substantial risk of serious harm and whether

---

[4] As discussed in Section II.C.6. below, Dr. Meden's involvement with Plaintiff's transfer to WCC was in the context of his treatment of Plaintiff.  This raises the question of whether Plaintiff's Eighth Amendment claim against Dr. Meden differs from his Eighth Amendment claims against the prison employees, and should be considered a claim for deliberate indifference with respect to his medical treatment.  In order for a plaintiff to prevail on an Eighth Amendment claim regarding his medical treatment, he must show that prison officials were deliberately indifferent to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97 (1976).  Allegations of negligent treatment are medical malpractice claims, and do not trigger constitutional protections.  *Id.* at 105-06 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  However, this issue was not raised by Defendant Meden and the Court declines to address it on the merits here.

they disregarded that risk by failing to take reasonable measures to abate it.

Defendants assert that they were not aware of a substantial risk of harm to Plaintiff, and deny that Plaintiff voiced any safety concerns to them.  (DE 46 at 36-37; DE 54 at 26-27; DE 46-3 at ¶¶ 4-8; DE 46-8 at ¶¶ 3-4; DE 46-9 at ¶¶ 3-4; DE 54-2 (SEALED); DE 54-3 ("I was transferred to [WCC] for mental health reasons.")) However, Plaintiff offers statements in his declarations that he did inform each of the Defendants of the safety risk, at or near the time of his transfer from MBP to WCC, but that they failed or refused to act.  (DE 86-2 at ¶¶ 10-11; DE 88-1 at ¶¶ 16-21.)  He further declared that he had also informed Defendants Salmi and Meden of the "situation" prior to that time and requested protection, but they failed to act.  (DE 86-2 ¶¶ 6-7; DE 88-1 at ¶¶ 5-6.) Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has thus created a genuine factual dispute as to Defendants Salmi's, Calzetta's, Viitala's and Meden's subjective awareness of a risk of harm.

Therefore, to summarize, Plaintiff's Eighth Amendment failure to protect claims against Defendants Govern, Giesen, LaCount, Niemisto and Huss should be **DISMISSED**.  But, Defendants' motions for summary judgment should be **DENIED** as to Plaintiff's Eighth Amendment failure to protect claims against Defendants Salmi, Calzetta, Viitala and Meden.

### 5.    Plaintiff's Retaliation Claims Fails as a Matter of Law

38

According to Plaintiff's complaint, Defendants Calzetta, Govern, Giesen, Viitala and Salmi retaliated against him for filing complaints and grievances on staff, in violation of the First Amendment.  (DE 1 at ¶ 53.)[5]  As I stated in Section C.1.c.ii. above, Grievance MBP-16-02-0303-17i does not exhaust Plaintiff's retaliation claims against the MBP State Defendants because that grievance does not allege or even mention retaliation.  Rather, that grievance states that "[t]he issue is that [Plaintiff] was transferred without [his] consent or consideration of a known safety risk in which the above individuals knew of[,] [sic]" that he was subsequently assaulted at WCC, and that the assault would not have happened if Policy Directive PD 05.01.140, Prisoner Placement and Transfer, was followed.  However, even if Grievance MBP-16-02-0303-17i did serve to exhaust Plaintiff's retaliation claim against the listed MBP Defendants, that claim would not survive summary judgment.

To assert a claim of retaliation under the First Amendment, Plaintiff must show that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would "deter a person of ordinary firmness" from continuing to engage in the conduct; and, (3) there is a causal connection between the elements such that the adverse action was "motivated at least in part by the

---

[5] Plaintiff also alleges retaliation claims against several WCC State Defendants, and those claims will be addressed once the Court rules on whether Plaintiff has exhausted any of his claims against those Defendants, following a bench trial or evidentiary hearing, as discussed in Section II.C.1.c.iv. above.

plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  Moreover, Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

### a.    Adverse Action

Defendants do not dispute that Plaintiff engaged in protected conduct, and do not address the adverse action prong.  (DE 46 at 31.)  An action is "adverse" if it 'would deter a person of ordinary firmness from the exercise of the right at stake." *Thaddeus-X*, 175 F.3d at 396.  Plaintiff contends that the two alleged attacks on him at WCC constitute the adverse action.  (DE 84 at 19.) However, there is no allegation that the <u>Defendants</u> assaulted Plaintiff—rather, he asserts that the alleged attacks were by a prison inmate(s).  These alleged attacks thus cannot constitute an adverse action by Defendants.

To the extent Plaintiff contends that his transfer to WCC was an adverse action, that claim also fails.  The Sixth Circuit has held that a mere prison transfer, without something more, is the type of *de minimis* deprivation that would not deter a prisoner of ordinary firmness from exercising his First Amendment rights.  *See Jones v. Caruso*, F. App'x 550, 553 (6th Cir. 2011).  Instead, a prisoner must plead (and ultimately prove) that there were "foreseeable, negative consequences" that

40

are "inextricably" bound to the transfer.  *Id.*  Defendants have presented evidence

that Plaintiff was in segregation and could not return to F Block ICP because of the

threatening behavior misconduct he received, and he was thus referred to WCC

Acute Care for mental health "for a higher level of care."  (DE 46-3 at ¶ 6.)

Plaintiff here has simply not demonstrated that the alleged attack(s) at WCC were a

"foreseeable, negative consequence" to his transfer to WCC.  Rather, the Court

would have to speculate to conclude that the claimed "adverse consequences" at

WCC were reasonably foreseeable to Defendants when he was transferred.  As

explained by the Sixth Circuit in considering a hypothetical about the "adverse

action" element:

> *[I]f the Plaintiff had been assaulted at the prison he were transferred* <u>*to*</u>, the Defendant contends, *then he could have attributed even this event to the Defendant*.  The Defendant overstates his argument.  Only those consequences that inextricably follow from a defendant's alleged retaliatory conduct (a transfer from filling out a transfer screen, for instance) would be considered in determining whether the plaintiff suffered an adverse action.  Similarly, a court may consider the reasonably foreseeable consequences that would follow from a retaliatory act in considering whether the plaintiff suffered an adverse action.  However, a defendant would not be held responsible for consequences unless his conduct were the proximate cause of them (*which would not be the case in the defendant's above hypothetical*).

(emphasis added).  *See Siggers-El v. Barlow*, 412 F.3d 693, 702 (6th Cir. 2005).

Accordingly, Plaintiff has failed to demonstrate that an adverse action was taken

against him that would "deter a person of ordinary firmness" from continuing to

engage in the conduct.

### b.   Causation

With regard to causation, Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). Even if one accepts that the wrongs alleged by Plaintiff constitute sufficiently adverse actions, however, he has still failed to state a claim because, as the State Defendants argue, he alleges no facts to show that the adverse actions were motivated by the protected conduct.

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state ... a claim under § 1983.' " *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) ( "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial") (internal quotations omitted); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("bare allegations of malice on the defendants' parts are not enough to establish retaliation claims"). In some

42

circumstances, temporal proximity "may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.' " *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)). However, "[c]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive." *Skinner v. Bolden*, 89 F. App'x 579, 580 (6th Cir. 2004).

Of the five MBP State Defendants Plaintiff asserts engaged in retaliation, only Defendants Calzetta, Viitala and Salmi had "some" connection to Plaintiff's housing around the time of the January 27, 2016 transfer to WCC Acute Care, the subject of the only arguably exhausted grievance. Plaintiff has simply failed to meet his burden to show that his claimed protected conduct was a substantial or motivating factor in these defendants' alleged retaliatory conduct. As stated above, "conclusory allegations of retaliatory motive" and 'bare allegations of malice on the defendants' parts" will not suffice, and that is all Plaintiff has here—asserting only these defendants transferred Plaintiff to WCC where he was attacked because Plaintiff had filed grievances against them and/or other WCC Defendants. Accordingly, his retaliation claims, to the extent they are exhausted, fail and should be **DISMISSED**.

> **6.** **Plaintiff's Claims for Negligence, Gross Negligence and Intentional Infliction of Emotional Distress Against Defendant Meden Fail as a Matter of Law**

Defendant Meden argues that Plaintiff's state law negligence, gross negligence and intentional infliction of emotional distress (IIED) against him are claims sounding in medical malpractice, and all such claims against health care providers, such as Dr. Meden, are governed by MCL 600.2912, *et seq.  See Bryant v. Oakpoint Villa Nursing Ctr.*, 684 N.W.2d 864, 871 (Mich. 2004) (recognizing the presumption that if a claim is made against a health care provider it is a claim sounding in medical malpractice).  Meden argues that Plaintiff did not comply with the prerequisites for bringing a medical malpractice claim under Michigan law. Under Michigan law, whether a claim sounds in medical malpractice requires a determination of two issues:  (1) whether the alleged negligent act occurred "within the course of a professional relationship;" and (2) whether the claims of negligent conduct necessarily "raise questions involving medical judgment." *Id.* at 871 (citations omitted).  If the answer to both of these questions is yes, the action is subject to the procedural and substantive requirement that govern medical malpractice actions. *Id.*  In this case Plaintiff asserts that he notified Defendant Meden that he was not safe in the general population, and complains that Meden failed to intervene or report the safety risk, but instead offered to have Plaintiff transferred to WCC.  (DE 1 at ¶ 30; DE 85 at 13.)  However, Plaintiff asserts he notified Defendant Meden of this concern in the course of his treatment, citing to his treatment notes as evidence.  (*Id.*, citing to DE 86-3 (SEALED).)  Plaintiff

44

alleges that Defendant Meden approached his cell on January 26, 2016 and offered to have him sent to WCC, and Plaintiff claims that he stated he did not feel comfortable with being transferred there.  (DE 1 at ¶ 30.)  Plaintiff's treatment note from his visit with Dr. Meden that day notes that Plaintiff appears to be experiencing "Seg Psychosis" and that Plaintiff is "enmeshed in his fairly fixed paranoid delusional system[.]"  (DE 54-2 at 2 SEALED).)  The treatment note refers to "today's referral to WCC Acute Care, which is from my CPE formulation of 9/3/15," and acknowledges that Plaintiff "has been resistant to our recommendations of WCC placement due to paranoia and unfamiliarity with that setting" but that Dr. Meden "was able to get [Plaintiff's] agreement with WCC placement – his main concern is of getting trustworthy treatment for a sustained period."  (*Id.*).  Dr. Meden further noted that "WCC staff are welcome to call me if I can be of help."  (*Id.*)  Plaintiff further stated in his deposition that he "was transferred to Woodland for mental health reasons."  (DE 54-3 at 3 (SEALED).)  Accordingly, Dr. Meden's involvement with Plaintiff's transfer to WCC was in the context of his treatment of Plaintiff, "raise[s] questions involving medical judgment," and occurred "within the course of [their] professional relationship."  *See Bryant*, 471 Mich. at 422.  Therefore, Plaintiff's negligence, gross negligence and intentional infliction of emotional distress claims are subject to the prerequisites of bringing a medical malpractice claim.  *See Alexander v. Fillion*,

45

No. 2:16-cv-64, 2017 WL 6887038, at *4 (W.D. Mich. Oct. 18, 2017) (dismissing plaintiff's gross negligence and intentional infliction of emotional distress claims because plaintiff failed to comply with the prerequisites of bringing a medical malpractice claim), *report and recommendation adopted in pertinent part and denied in part on other grounds*, 2018 WL 3545333 (W.D. Mich. Jan. 9, 2018).

Pursuant to MCL 600.2912d, a plaintiff who brings a medical malpractice claim must include with his complaint an affidavit of merit signed by a health professional, attesting to the defendant's failure to meet the standard of patient care. Federal courts have held that dismissal is appropriate when a plaintiff fails to comply with this requirement. *See Alexander v. Fillion*, 2017 WL 6887038, at *4 (citing *Briggs v. Burke*, No. 15–2282, at 7 (6th Cir. July 29, 2016) (unpublished) (holding that the dismissal of an inmate's medical malpractice claim was appropriate because he failed to include a health care professional's affidavit with his complaint as required by MCL § 600.2912d); *Raper v. Cotroneo*, No. 1:17-cv-368, 2017 WL 4173507, at *4 (W.D. Mich. Sept. 21, 2017) (dismissing an inmate's medical malpractice claim because he failed to comply with Mich. Comp. Laws §§ 600.2912b and 600.2912d); *Boone v. Heyns*, No. 12-14098, 2017 WL 3977524, at *4 (E.D. Mich. Sept. 11, 2017) (dismissing an inmate's negligence, medical malpractice, and intentional infliction of emotional distress claims because he failed to comply with MCL §§ 600.2912b and 600.2912d); *Simmons v. Rogers*, No.

46

1:14-cv-1242, 2017 WL 1179376, at *5 (W.D. Mich. Mar. 30, 2017) (dismissing

an inmate's gross negligence claim that sounded in medical malpractice because he

did not file an affidavit of merit as required by MCL § 600.2912d)). Here, Plaintiff

did not include an affidavit of merit signed by a health professional. Therefore,

Plaintiff's state law claims against Defendant Meden should be dismissed because

he failed to comply with the prerequisites of bringing a medical malpractice claim

under Michigan law.[6]

Even if Plaintiff's gross negligence and IIED claims were not subsumed by

his medical malpractice claim, or put another way, even if both of these claims did

not "sound" in medical malpractice, the alleged and described conduct of Dr.

Meden does not rise to the level of proof necessary to establish either claim. At

best, Plaintiff describes only ordinary or professional malpractice. There is nothing

"gross" or reckless about the breach of duty he alleges or, in context, the actions he

describes. *See Jackson v. Saginaw County*, 458 Mich. 141, 150, 580 N.W.2d 870,

874 (1998) (prison doctor not grossly negligent for a failure to perform a

laryngoscopic examination because not "'conduct so reckless as to demonstrate a

substantial lack of concern for whether an injury results.'") (quoting Mich. Comp.

---

[6] Defendant Meden also argues that Plaintiff failed to comply with MCL §
600.2912b, which requires Plaintiff to provide notice of intent to sue. Because I
find that Plaintiff's negligence, gross negligence and intentional infliction of
emotional distress claims against Defendant Meden should be dismissed for failing
to comply with MCL § 600.2912d, I will not address this argument.

Laws 691.1407(8)(a)); *Maiden v. Rozwood*, 461 Mich. 109, 122, 597 N.W.2d 817,

824 (1999) ("ordinary negligence does not create a material question of fact

concerning gross negligence"). *See also,* Grant H. Morris, *Gross Negligence in

Michigan-- How Gross Is It?*, 16 Wayne L. Rev. 457, 468 (1969) (arguing that the

term "gross negligence" should be eliminated from the legal lexicon as courts are

unable to properly define and apply the term). Moreover, gross negligence in

Michigan is not a tort in and of itself; rather, in this factual scenario, it is simply a

level of proof which can statutorily overcome governmental immunity under state

law. *Bricker v. Ausable Valley Cmty. Mental Health Servs*., 2009 WL 211883, *8

(Mich. Ct. App. 2009) ("[A]n assertion of gross negligence by itself is not an

independent tort. MCL 691.1407(2) does not by itself create a cause of action

called 'gross negligence.'") (citing *Rakowski v. Sarb*, 269 Mich. App. 619, 627,

713 N.W.2d 787 (2006)). Nor has Plaintiff demonstrated conduct which is "willful

and wanton." *See Gross Negligence*, BLACK'S LAW DICTIONARY (10th ed. 2014).

Furthermore, under Michigan common law, in order to prevail on an IIED claim, a

plaintiff must prove conduct "so outrageous in character, and so extreme in degree,

as to go beyond all possible bounds of decency, and to be regarded as atrocious

and utterly intolerable in a civilized community." *Warren v. June's Mobile Home

Village & Sales, Inc.,* 66 Mich. App. 386, 239 N.W.2d 380 (1976).[7] Even in the

---

[7] There has been some debate about whether IIED is even a viable claim in

48

light most favorable to Plaintiff, Dr. Meden's alleged conduct does not come close to this level of behavior.

### 7. Plaintiff's Equal Protection Claim against All Defendants Fails as a Matter of Law

Plaintiff broadly alleges in this complaint a claim against "ALL Defendants" for "violation of the equal protection clause of the 14th amendment" because they were "personally aware of a serious safety risk and intentionally failing/refusing to act on [it]." (DE 1 at ¶ 52.) Defendant Meden argues that Plaintiff's claim against him for violation of his Fourteenth Amendment right to equal protection should be dismissed because he has not submitted any evidence to support or establish this claim. (DE 53 at 27-28.) Plaintiff summarily asserts in response the he is "part of a 'class' of the 'mentally disabled' or 'American[s] with disability'" and he "had a right to be treated just in the course of treatment, not subjected to assaults because Meden failed to act." (DE 85 at 21.)

---

Michigan. The Michigan Supreme Court stated, "We express no opinion on the accuracy of the Court of Appeals observation that Michigan recognizes a tort action for the intentional infliction of mental distress." *Kewin v. Massachusetts Mut. Life Ins. Co.*, 409 Mich. 401, 421, 295 N.W.2d 50, 56 (1980). The court has yet to rule definitively on the cause of action, one way or another. *See VanVorous v. Burmeister*, 262 Mich. App. 467, 481, 687 N.W.2d 132, 141-42 (2004). In contrast, the Court of Appeals has recognized it as a viable tort since 1986. *Rosenberg v. Rosenberg Bros. Special Account*, 134 Mich. App. 342, 350, 351 N.W.2d 563 (1986). Published opinions of the Michigan Court of Appeals have "precedential effect under the rule of *stare decisis*." Mich. Ct. R. 7.215(C)(2). Thus, the tort is recognized under Michigan common law, at least for now.

The Equal Protection Clause of the Fourteenth Amendment "protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Scarborough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). "The Equal Protection Clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). Plaintiff does not suggest that he is a member of a suspect class, and "prisoners are not considered a suspect class for purposes of equal protection litigation." *Jackson v. Jamrog*, 411 F.3d 615, 619 (6th Cir. 2005); *see also City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 442 (holding persons with physical or mental disabilities are not part of a suspect class under the Equal Protection Clause). Plaintiff's claim therefore is reviewed under the rational basis standard, and under that standard, "government action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006). To prove his equal protection claim, Plaintiff must demonstrate "intentional and arbitrary discrimination" by the state, that is, he must demonstrate that he "has been intentionally treated differently from others

50

similarly situated and that there is no rational basis for the difference in treatment."
*See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The Court is required,
pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A to dismiss an action if, at any time,
it determines that Plaintiff has failed to state a claim. As explained above, Plaintiff
here asserts only a conclusory allegation of denial of equal protection and therefore
has failed to state a facially plausible equal protection claim against <u>any</u> defendant.
(*See* DE 1 at ¶ 52.) Plaintiff's conclusory allegations fail to identify any similarly
situated individual who was treated differently, much less that any different
treatment was intentional. Consequently, Plaintiff's equal protection claim against
**all Defendants** should be **DISMISSED** pursuant to 28 U.S.C. §§ 1915A,
1915(e)(2)(B). Furthermore, the Court should also decline Plaintiff's request to
"construe[]" his claim as "an Americans with disability Act claim." (DE 85 at 21.)
Plaintiff is "the master of his complaint," and thus, the Court looks to the pleadings
to define his claims. *Roddy v. Grand Trunk W. R.R., Inc.*, 395 F.3d 318, 322 (6th
Cir. 2005). He cannot be permitted to amend his complaint and add new claims in
his response brief.

### 8. Qualified Immunity

The State Defendants assert that they are entitled to qualified immunity with
respect to Plaintiff's claims. Determining the applicability of qualified immunity
requires a two-step inquiry into whether the facts, when viewed in the light most

favorable to the plaintiff, would permit a reasonable juror to find that: (1) the

defendant violated a constitutional right; and (2) the right was clearly established.

*Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005).  A plaintiff

will defeat a defense of qualified immunity if he can present sufficient evidence to

prove the existence of a genuine issue of material fact regarding the issue of

immunity or if the undisputed facts show that the defendant violated his clearly

established rights.  *Noble v. Schmitt*, 87 F.3d 157, 161 (6th Cir. 1996).  Given the

above conclusion that there remain questions of fact pertaining to Plaintiff's Eighth

Amendment claims against Defendants Salmi, Calzetta, Viitala and Meden, I

cannot say that these defendants are entitled to qualified immunity.  *Brandenburg

v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989) (when 'the legal question of

immunity is completely dependent upon which view of the facts is accepted by the

jury," the "jury becomes the final arbiter of [a] claim of immunity"). Further,

prisoners enjoy a clearly established right to be free from injury at the hands of

other prisoners:  "prison officials … must take reasonable measures to guarantee

the safety of the inmates" and "have a duty … to protect prisoners from violence at

the hands of other prisoners."  *Farmer*, 511 U.S. at 832, 833 (quotation marks and

citation omitted); *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("That the

Eighth Amendment protects against future harm to inmates is not a novel

proposition.  The Amendment, as we have said, requires that inmates be furnished

52

with the basic human needs, one of which is 'reasonable safety.'"); *Brown v. Scott*, 329 F.Supp.2d 905, 914 (E.D. Mich. 2004) (finding "the plaintiff's rights were clearly established by at least 1994, when the Supreme Court held that a prisoner may bring a claim against a prison official, based on harm perpetrated by a fellow inmate, if the prison official acted deliberately indifferent 'to inmate health and safety.'") (quoting *Farmer*, 511 U.S. at 834).

### D.   Conclusion

For the reasons set forth above, I find that:

(1) Grievance MBP-16-02-0363-17i exhausts Plaintiff's Eighth Amendment failure to protect claims against MBP State Defendants and Defendant Meden regarding his January 27, 2016 transfer to WCC;

(2) Grievance MBP-16-02-0363-17i does not exhaust Plaintiff's retaliation claim against MBP State Defendants, and that claim should be **DISMISSED**;

(3) Plaintiff's claims for declaratory relief against the MBP Defendants and Defendant Meden are moot and should be **DISMISSED**;

(4) Grievance MBP-16-02-0363-17i does not operate to exhaust Plaintiff's failure to protect claims against the WCC State Defendants;

(5) There is a question of fact as to whether the February 12, 2016 grievance filed at WCC exhausts Plaintiff's failure to protect claims against the WCC State Defendants that should be resolved at a bench trial or evidentiary hearing.  However, this grievance does not operate to exhaust Plaintiff's failure to protect claims

against the MBP State Defendants and Defendant Meden, and those MBP-based defendants cannot held responsible for an alleged failure to protect Plaintiff when he was already in custody at another facility;

(6) Plaintiff's claims against Defendant Daphne Johnson should be **DISMISSED** for lack of personal involvement;

(7) Plaintiff's claim for money damages against Defendants Calzetta, Govern, Giesen, Viitala, LaCount, Niemisto, Huss, and Johnson in their official capacity are barred by the Eleventh Amendment and should be **DISMISSED**;

(8) Plaintiff's Eighth Amendment failure to protect claims against Defendants Govern, Giesen, LaCount, Niemisto and Huss should be **DISMISSED** for lack of personal involvement in the January 27, 2016 transfer to WCC;

(9) Defendants' motions for summary judgment should be **DENIED** as to Plaintiff's Eighth Amendment failure to protect claims against Defendants Salmi, Calzetta, Viitala and Meden;

(10) Plaintiff's retaliation claims, to the extent they are exhausted, fail and should be **DISMISSED**;

(11) Plaintiff's state law claims against Defendant Meden should be **DISMISSED** because Plaintiff failed to comply with the prerequisites of bringing a medical malpractice claim under Michigan law and because they do not rise to the level of "outrageous" or "intolerable" conduct required to prove intentional infliction of emotional distress;

(12) Plaintiff's equal protection claim against all Defendants should be **DISMISSED** pursuant to Defendant Meden's motion for summary judgment and 28 U.S.C. §§ 1915(e)(2)(B) and 1915A;

(13) Defendants Salmi, Calzetta, Viitala and Meden have not established entitlement to qualified immunity on the Eighth Amendment claims; and

(14) The State Defendants did not move for summary judgment on Plaintiff's state law claims of negligence, gross negligence and intentional infliction of emotional distress, or Plaintiff's conspiracy claims under 42 U.S.C. § 1985, and accordingly those claims should not be dismissed.

To sum:

(a) The status of the exhaustion of Plaintiff's claims against the WCC State Defendants should be resolved at a bench trial or evidentiary hearing;

(b) Plaintiff's claims against Defendant Daphne Johnson should be **DISMISSED** for lack of personal involvement;

(c) Plaintiff's Eighth Amendment failure to protect claim should be **DISMISSED** against Defendants Govern, Giesen, LaCount, Niemisto and Huss, but should **proceed** against Defendants Salmi, Calzetta, Viitala and Meden;

(d) Plaintiff's retaliation claim should be **DISMISSED**;

(e) Plaintiff's Equal Protection claim should be **DISMISSED** against all Defendants;

(f) Plaintiff's conspiracy claims under 42 U.S.C. § 1985 should **proceed**;

(g) Plaintiff's negligence, gross negligence and intentional infliction of emotional distress claims should be **DISMISSED** against Defendant Meden but should **proceed** against the MBP State Defendants;

(h) Plaintiff's claim for declaratory relief against the MBP State Defendants and Defendant Meden should be **DISMISSED**; and

(i) Plaintiff's claims for money damages against Defendants Calzetta, Govern, Giesen, Viitala, LaCount, Niemisto, Huss, and Johnson should be **DISMISSED**.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an

56

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.*  If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated: February 26, 2018              s/Anthony P. Patti
                                      Anthony P. Patti
                                      UNITED STATES MAGISTRATE JUDGE


**Certificate of Service**

I hereby certify that a copy of the foregoing document was sent to parties of record
on February 26, 2018, electronically and/or by U.S. Mail.

                                      s/Michael Williams
                                      Case Manager for the
                                      Honorable Anthony P. Patti