UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

D'ANDRE ALEXANDER,

    Plaintiff       Case No. 2:16-CV-13293
             District Judge Mark A. Goldsmith
v.            Magistrate Judge Anthony P. Patti

NICHOLAS CALZETTA,
FRED GOVERN, ERICA
HUSS, DARRIN VIITALA,
MANDI SALMI, KENNETH
NIEMISTO, KRISTINE
GIESEN, TERRY MEDEN,
CHAD LaCOUNT, HANNA
SAAD, DR. ROSEN, C/O
WATKINS, C/O LEWIS, C/O
LEE, C/O SLAUGHTER, C/O
HOUSTON, DAPHNE M.
JOHNSON and RICHARD
IDEMUDIA

    Defendants.
_____/

## REPORT ON EVIDENTIARY HEARING REGARDING EXHAUSTION (DE 158) AND RECOMMENDATION TO GRANT WCC STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES (DE 46)

I.  **RECOMMENDATION**:  The Court should find that Plaintiff failed to

exhaust his administrative remedies as to his constitutional claims against the

WCC State Defendants and grant Defendants' motion for summary judgment (DE

46) based on Plaintiff's failure to exhaust his administrative remedies.

## II.   REPORT

### A.   Background

#### 1.   Factual background

The factual background in this matter has been extensively set forth in my prior report and recommendation (DE 93), as well as the Court's Amended Opinion and Order (DE 103) and need not be repeated in full here. Accordingly, I will only discuss the facts relevant to the issue of exhaustion of administrative remedies of Plaintiff's constitutional claims against the defendants associated with the Woodland Correctional Facility.

In brief summary, Plaintiff D'Andre Alexander (#731077) is currently incarcerated at the Michigan Department of Corrections (MDOC) Macomb Correctional Facility (MRF) in New Haven, Michigan. *See* www.michigan.gov/corrections, "Offender Search."  On September 8, 2016, while incarcerated at MRF, Plaintiff filed the instant lawsuit against eighteen (18) defendants, who are described as follows:

- **nine (9) Defendants** are associated with the MDOC's Marquette Branch Prison (**MBP**) (Nicholas Calzetta, Fred Govern, Kristine Giesen, Darrin Viitala, Chad LaCount, Kenneth Niemisto, Erica Huss, Mandi Salmi and Terry Meden), which is located in Michigan's upper peninsula, (the "MBP State Defendants")

- **eight (8) Defendants** are associated with the MDOC's Woodland Center Correctional Facility (**WCC**) (Hanna Saad, Derek Rosen, Melvin Watkins, John Lewis, Rodney Lee, Kyle Slaughter, Bobby Houston and Richard Idemudia), which is

2

located in Whitmore Lake, Michigan, (the "WCC State Defendants") and

- **one (1) Defendant** is associated with the **MDOC's Office of Legal Affairs** (Daphne Johnson).

(DE 1 at ¶¶ 5-12.) The facts underlying his complaint span the period from February 2, 2015, when Plaintiff was incarcerated at MBP, through February 2016, when Plaintiff was incarcerated at WCC. (DE 1 at ¶¶ 4, 13-48.)

Plaintiff alleges that he was involved in a fight on February 2, 2015, while incarcerated in the MBP, and taken into segregation. While in segregation, Plaintiff alleges that MBP staff intentionally allowed for his flatscreen television to be stolen in retaliation for filing grievances and a lawsuit (filed on January 23, 2015). After he was released from segregation and learned who had stolen his television, he alleges that he notified an officer and that he was then labeled a "snitch," a hit was ordered, and he was targeted by fellow prisoners. Plaintiff alleges that his multiple requests for protection to MBP officials between May 2015 through January 2016 went unheeded. (*Id.* at ¶¶ 13-26.) The State Defendants[1] either deny that Plaintiff asked for protection or do not recall him requesting such protection. (DEs 46-2 – 46-9.)

---

[1] Defendants' motion for summary judgment identified the "State Defendants" as Defendants Nicholas Calzetta, Fred Govern, Erica Huss, Darrin Viitala, Mandi Salmi, Kenneth Niemisto, Kristine Giesen, Chad LaCount, Melvin Watkins, John Lewis, Rodney Lee, Kyle Slaughter, Bobby Houston, Daphne Johnson, and Richard Idemudia. (DE 46 at 2.)

On January 27, 2016, Plaintiff was informed he would be transferred to WCC. Plaintiff alleges that at his first treatment team meeting after his transfer to WCC, he informed WCC staff about the hit placed on him and that he feared for his safety. On February 3, 2016, Plaintiff alleges that a fellow prisoner heard him speaking to another prisoner about the hit on him, and that the prisoner announced himself as a member of the gang that put the hit on Plaintiff and then attacked him. Plaintiff alleges that he expressed his safety concerns to WCC State Defendants Saad, Rosen, Watkins, Lewis and Lee, but they refused to accommodate his needs. (DE 1 at ¶¶ 31-37.) On February 9, 2016, Plaintiff filed a grievance against MBP Defendants complaining that he "was transferred without [his] consent or consideration of a known safety risk" and that he was subsequently assaulted at WCC (Grievance No. MBP-16-02-0363-17i). (DE 84 at 9, citing DE 88 at 3.)

Of particular pertinence to this report, Plaintiff alleges that he was assaulted again on February 12, 2016 by a different prisoner and that he sought protection from WCC State Defendants Slaughter and Houston, but they refused to act. (DE 1 at ¶¶ 41-42.) That same day, Plaintiff states that he filed a grievance naming MBP and WCC State Defendants (the "Disputed Grievance"). He claims, however, that he never received a response nor a receipt with a grievance identifier number for this grievance, and that he therefore could not appeal the grievance. Plaintiff argues that the grievance process was not reasonably available to him, and

4

that the Disputed Grievance should be deemed exhausted.  (DE 84 at 13-14, citing DE 88 at 25.)

### 2.    Procedural history

The State Defendants filed a motion for summary judgment on June 27, 2017 (DE 46); and (2) Defendant Terry Meden filed a motion for summary judgement on July 11, 2017.  (DEs 53, 54 (SEALED).)  Plaintiff filed responses to both motions.  (DEs 84, 85, 88.)  On April 3, 2018, the Court entered an Amended Opinion and Order adopting in part my Report and Recommendation (DE 93), granting in part and denying in part the State Defendants' motion for summary judgment, and granting in part and denying in part Defendant Meden's motion for summary judgment.  (DE 103.)[2]  That Amended Opinion and Order explained that "the following claims are dismissed:

- Eighth Amendment claims against Defendants Calzetta, Govern, Huss, Viitala, Salmi, Niemisto, Giesen, LaCount, and Johnson;

- Alexander's claims for money damages against Defendants Calzetta, Govern, Giesen, Viitala, LaCount, Niemisto, Huss, and Johnson in their official capacity;

- Equal protection claims against all Defendants;

- Retaliation claims against Defendants Calzetta, Govern, Viitala, Salmi, and Giesen; and

---

[2] This Opinion and Order amended the Opinion and Order issued on March 30, 2018 (DE 102), to clarify which claims have been dismissed and to modify the language regarding Plaintiff's third objection.  (DE 103 at n.1.)

- Negligence, IIED, and gross negligence claims against Dr. Meden.

Going forward, the following claims remain:

- Eighth Amendment claims against the WCC-based State Defendants and Dr. Meden;

- Retaliation claims against certain WCC-based State Defendants (Slaughter and Idemudia);

- Conspiracy claims under 42 U.S.C. § 1985 against certain MBP-based State Defendants (Calzetta, Govern, Huss, Viitala, Salmi, Niemisto, Giesen, and LaCount) and certain WCC-based State Defendants (Slaughter and Houston); and

- State law claims for gross negligence, negligence, and IIED against all State Defendants."

(DE 103 at 18.)[3]

With regard to Plaintiff's Eighth Amendment and retaliation claims against the WCC State Defendants, the State Defendants had argued in their June 27, 2017 motion for summary judgment that Plaintiff failed to exhaust his administrative remedies as to his constitutional claims against them because he "did not pursue any grievances relating to the allegations against the WCC State Defendants to

---

[3] The State Defendants have subsequently filed, with leave of Court, a motion to dismiss Plaintiff's 45 U.S.C. § 1985 conspiracy claims and state law claims. (DE 107.) Defendant Meden filed, again with leave of Court, a second motion for summary judgment to address Plaintiff's Eighth Amendment claim against him. (DE 116.)  And, Defendant Saad has filed a motion to dismiss/summary judgment. (DEs 146, 147.)  The Court will consider these motions separately, taking into account the recently developed evidentiary record which is discussed herein.

Step III" and that "[t]he only WCC grievance was received at Step I on April 19, 2016, and involved a legal mail claim irrelevant to this suit." (DE 46 at 20, 26.) Plaintiff asserted in response that he filed a grievance at WCC on February 12, 2016, regarding being attacked while housed at WCC, but he claimed that he never received a response nor a receipt with an identifier number and thus he could not proceed with an appeal.  (DE 84 at 13-14.) This Court held that "[t]here is a question of fact as to whether the February 12, 2016 grievance filed at WCC exhausts Plaintiff's failure to protect [and retaliation] claims against the WCC State Defendants that should be resolved at a bench trial or evidentiary hearing." (DE 93 at 27, 39 n.5, 53, 55; DE 103 at 4.)  That evidentiary hearing was held on September 12, 2018.  (DE 158.)

### 3.    Evidentiary hearing

The evidence presented at the September 12, 2018 hearing consisted of: (1) exhibits submitted by the MDOC Defendants; (2) exhibits submitted by Defendants Meden and Saad; (3) testimony from Richard Dennis Russell, the MDOC Hearings Administrator and Grievance Section Manager; (4) testimony from Melissa Giraud, the Grievance Coordinator and Hearing Investigator for WCC; and (5) testimony from Plaintiff.  Plaintiff also directed the Court's attention to an exhibit previously submitted to the Court with his response to Defendants' motion for summary judgment.

7

### a.    Exhibits admitted

During the hearing, the Court admitted two exhibits: (1) a grievance Plaintiff

filed on May 15, 2015, Grievance MBP-15-05-0848-11c (DE 158 at 54, admitting

DE 167); and (2) an exhibit to Plaintiff's complaint, namely, a copy of the

Disputed Grievance (DE 158 at 23, admitting DE 1 at 21). Plaintiff also referred to

Exhibit 6 to his response to Defendants' motion for summary judgment, which was

also a copy of the Disputed Grievance. (DE 158 at 63, referring to DE 88 at 25.)

### b.    Richard Dennis Russell's testimony

Russell testified that he is the hearings administrator and the grievance

section manager in the MDOC's Office of Legal Affairs in Lansing, Michigan, and

that his duties include overseeing the Step III grievance process.  (DE 158 at 7.)

He broadly described the MDOC grievance process, as set forth in Policy Directive

(PD) 03.02.130, and opined that the Disputed Grievance was "never filed" and not

properly exhausted because there is no grievance identifier number assigned to it

and there is no record of this grievance in the Step III database.  (*Id.* at 8, 18-20.)

Russell agreed that the MDOC grievance form is a "multiform" consisting of

several carbon-copied pages, and that the "goldenrod copy" of the grievance form

is designated for the prisoner to keep "to appeal to his steps 2 and 3 once they file

at step 1."  (*Id.* at 25-26, 34.)  He admitted that he was not at the WCC on February

12, 2016, the date Plaintiff states he filed the Disputed Grievance, and later

conceded that he is not "familiar with" how the grievance process "functions at the facility level and what copy [of the multiform document] the prisoner has or doesn't have[.]" (*Id.* at 30, 35-36.)

Russell agreed that paragraph S of PD 03.02.130 states that grievances and grievance appeals should be considered filed on the date sent by the grievant, but asserted the purpose of that provision is for "purposes of counting the days" until a response is required, and that the grievance still must be actually received by the grievance coordinator to be considered "filed." (*Id.* at 31-33.) He testified that production of the goldenrod copy of a grievance by a prisoner "would be proof that a prisoner *wrote* a grievance. It isn't proof the prisoner *filed* a grievance." (*Id.* at 39 (emphases added).) Russell conceded, upon questioning by counsel for Dr. Saad, that the grievance Plaintiff alleges he filed on February 12, 2016 does not "detail" any "contact" Plaintiff would have had with Dr. Saad on that date, *i.e.*, the date of the alleged assault. (*Id.* at 24.)

### c.   Melissa Giraud's testimony

Giraud testified that she has been employed as the grievance coordinator at WCC since February 1, 2016, and that she is responsible for processing Step I and Step II grievances at WCC. (DE 158 at 40-41.) She explained that once a prisoner fills out the grievance form, the prisoner *keeps the goldenrod copy* and sends the *other* four copies of the multiform to her through the institutional mailbox. (*Id.* at

41.)  She explained an "an officer assigned on [the] midnight shift … goes around to every unit and picks up the mail." (*Id.* at 44.)  The mail is then delivered to the mail room where it is sorted by mailroom staff and any grievances are then forwarded to her.  (*Id.*)  Giraud acknowledged that paragraph S of PD 03.02.130 states that grievances are considered filed on the day sent by the grievant and conceded that it is possible that a grievance could be deposited in a mailbox but not make it to her office.  (*Id.* at 48.)

Giraud testified that when she receives a Step I grievance form, she writes the date received at the top of the form, assigns a grievance identifier number, and then assigns the grievance to a respondent.  (*Id.* at 42.)  She testified that she then "print[s] off a form [a "grievance receipt"] saying that [she] received [the grievance] so that [the prisoner] can keep it with their goldenrod copy so then it's officially filed."  (*Id.* at 43.)  Giraud explained that if, however, a grievance is incomplete in some way, she will "usually write a Post-it note or a memo form" detailing "what they're missing in order to file a grievance" and "send it back to them … to notify them that they haven't properly filed it and that they need to add that and resend it."  (*Id.* at 42.)

Giraud affirmed that, as the grievance coordinator, she sees every Step I and Step II grievance filed at WCC, but that she does not remember seeing the Disputed Grievance.  (*Id.* at 45.)  She testified that she conducted a search for all

10

grievances filed by Plaintiff from January through March 2016 at WCC and found a "large number" of grievances, but that she did not find the Disputed Grievance in that search. (*Id.* at 44-45, 50-52, 58-59.) She agreed that she cannot tell simply by looking at the goldenrod copy of the Disputed Grievance whether the grievance was submitted or not. (*Id.* at 50.) She further testified that she does not recall receiving a notice or a kite from Plaintiff requesting a grievance receipt or his otherwise informing her that he had not received a response to any grievance. (*Id.* at 52, 55-56, 58.) She explained that if she had received such a kite from Plaintiff, she would have either met with him to read his goldenrod copy or asked him to send a copy of the grievance to her. She would then confirm whether she had received it, and if not, let him know so that he could re-file the grievance. (*Id.* at 56.)

At the hearing, Giraud reviewed Grievance No. MBP-15-05-0848-11c, which is an earlier grievance filed by Plaintiff at MBP dated May 15, 2015, in which he complains that he "submitted grievances in which staff even told me they turned in, but have not gotten receipts for them[.]" (*Id.* at 57; DE 167.) Giraud testified that she does not have a similar grievance filed by Plaintiff at WCC complaining about not receiving receipts or responses to grievances. (DE 158 at 57.) Finally, she agreed with counsel for Dr. Saad that the Disputed Grievance

does not indicate that Plaintiff brought his complaint to the attention of Dr. Saad. (*Id.* at 46-47.)

### d.    Plaintiff's testimony

Plaintiff testified that he filed the Disputed Grievance, but that he never received a response or a grievance receipt, which prevented him from appealing it. (DE 158 at 63.)  He stated that he has been utilizing the MDOC grievance policy for nine years and requested that the Court take judicial notice that he has a history of filing grievances and exhausting those grievance to Step III.  (*Id.* at 64-65.)  He also requested the Court to take notice pursuant to Federal Rule of Evidence 406 that he has a "habit of filing grievances and vindicating [his] rights anytime [he] believe[s] that they have been violated."  (*Id.* at 69.)  Plaintiff testified that he usually keeps in his possession "a stack of grievances and disbursements and all other type of stationary that [he] need[s] and [he] use[s] on a regular basis" and that he used one of these grievance forms from his "stack" to file the Disputed Grievance at WCC on February 12, 2016.  (*Id.* at 66-67.)

Plaintiff also testified that he "always" sends kites when he does not receive a response to a grievance and that he sent a kite complaining that he did not receive a response to the Disputed Grievance, but that he did not receive a response to that kite. (*Id.* at 67-68.)  He stated that that he does not remember when he sent the kite and that he did not keep a copy of it, although he "usually keep[s] carbon copies of

12

all [his] kites[.]" (*Id.* at 68.)  Plaintiff stated that this situation—where he submits a

grievance and alleges that it has not been processed—happens "all the time" and

that he "might have to file a grievance multiple times just to get a response or try to

have a designated staff member deliver it personally[.]" (*Id.* at 70-71.)  He admits

that he did not file the Disputed Grievance multiple times.  (*Id.* at 71.)  Plaintiff

also admits that he did not file a separate grievance complaining that he did not

receive a response to the Disputed Grievance.  (*Id.* at 68.)

On cross-examination, counsel for Dr. Saad asked Plaintiff why he added

Dr. Saad to the April 3, 2016 Step II appeal of his grievance *previously filed at*

*MBP* regarding the alleged February 3, 2015 assault, Grievance No. MBP-16-02-

0363-17i, if he believed he had already grieved the doctor in his Disputed

Grievance at WCC. (*Id.* at 73.) Plaintiff responded that he "wanted to make sure

[he] crossed all [his] T's and dotted [his] I's."  (*Id.*)  He also claimed that he added

Dr. Saad and the WCC State Defendants at Step II of the previously-filed MBP

grievance because the grievance coordinator at MBP required a grievant to add any

new issues that related to an issue already grieved.  (*Id.* at 73-74.)

## B.    Standard

### 1.    Prison Litigation Reform Act

Under the Prison Litigation Reform Act (PLRA), a prisoner may not bring

an action "with respect to prison conditions under section 1983 of this title, or any

13

other Federal law . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  Congress enacted this provision to address the "outsized share" of prisoner litigation filings and to ensure that "the flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit." *Jones v. Bock*, 549 U.S. 199, 203 (2007).  Put another way, the purpose of § 1997e(a) is to "reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  In addition, exhaustion "gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of [the agency's] procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (internal quotation marks and citations omitted).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought into court." *Jones*, 549 U.S. at 211.  The prison's grievance process determines when a prisoner has properly exhausted his or her claim. *Id.* at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").  Even where a prisoner has made some attempts to go through the prison's grievance process, "[t]he plain language of the statute makes exhaustion a precondition to filing an action in federal court." *Freeman v. Francis*, 196 F.3d

14

641, 645 (6th Cir. 1999). The prisoner "may not exhaust his [or her] administrative remedies during the pendency of the federal suit." *Id.* (citations omitted); *see also Woodford*, 548 U.S. at 95 ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . ."). However, "the PLRA and Federal Rule of Civil Procedure 15 permit a plaintiff to amend his complaint and add claims that were exhausted after the commencement of the lawsuit, provided that the plaintiff's original complaint contained at least one fully exhausted claim." *Mattox v. Edelman*, 851 F.3d 583, 595 (6th Cir. 2017).

"[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. Instead, failure to exhaust administrative remedies is an affirmative defense under the PLRA. As such, defendants bear the burden of proof on exhaustion. *Surles v. Andison*, 678 F.3d 452, 456 (6th Cir. 2012) ("A PLRA defendant bears the burden of proving that a PLRA plaintiff has not exhausted his administrative remedies."). However, once a defendant carries the burden of showing that there was a generally available administrative remedy, and that the prisoner did not exhaust that remedy, "the prisoner has the burden of production. That is, the burden shifts to the prisoner to come forward, with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively

15

unavailable to him." *Bennett v. Mich. Dep't of Corr.*, No. 15-14465, 2017 WL 3208591, at *5 (E.D. Mich. July 24, 2017) (quoting *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014)), citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996) ("[T]he burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile."); *see also Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011) ("Once a defendant proves that a plaintiff failed to exhaust, however, the onus falls on the plaintiff to show that remedies were unavailable to him….")), *report and recommendation adopted*, 2017 WL 4230645 (E.D. Mich. Sept. 25, 2017), *reconsideration granted on other grounds*, 2018 WL 1522360 (E.D. Mich. Mar. 28, 2018). The Sixth Circuit "has required a prisoner to make 'affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable.'" *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015) (citing *Napier v. Laurel Cnty.*, 636 F.3d 218, 223 (6th Cir. 2011) (citation omitted); *see also Brock v. Kenton Cnty.*, 93 F. App'x 793, 798 (6th Cir. 2004) (collecting cases)).

The Sixth Circuit holds that "disputed issues of fact regarding exhaustion under the PLRA present[] a matter of judicial administration that could be decided in a bench trial." *Lee*, 789 F.3d at 678. The rationale behind a judge making a preliminary determination regarding exhaustion is that "[a] jury might decide the

merits of the case that should never have gotten to the merits stage because the

judge should have found that the prisoner had failed to exhaust his administrative

remedies." *See Lee v. Freeman*, No. 16-14162, 2017 WL 4158794, at *6 (E.D.

Mich. Aug. 25, 2017) (quoting *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008)),

*report and recommendation adopted*, 2017 WL 4150789 (E.D. Mich. Sept. 19,

2017).  Within the context of these evidentiary hearings, federal district or

magistrate judges can resolve all genuine issues of material fact related to the

exhaustion of administrative remedies.  *See Lee*, 789 F.3d at 677-78 (noting that

"judges may resolve factual disputes relevant to the exhaustion issue without the

participation of a jury") (citations and internal quotation marks omitted).  Judges

are empowered to make credibility determinations and resolve factual disputes

pertaining to exhaustion. *Lee*, 789 F.3d at 680; *see also Towns v. Holton*, 346 F.

App'x 97, 100 (7th Cir. 2009) (noting that credibility findings based on demeanor

made at an evidentiary hearing typically are owed "great deference" by a reviewing

court). The district court's factual findings must be accepted unless they are clearly

erroneous.  *Lee*, 789 F.3d at 678-79 (citing *Anderson v. City of Bessemer City*, 470

U.S. 564, 573 (1985)); *Hill v. Smith*, 136 F. App'x 271, 274 (3d Cir. 2008) (review

of district court's "factual findings on exhaustion is for clear error, giving due

regard for the opportunity of the trial court to judge the credibility of the

witnesses.").  And, "[w]here there are two permissible views of the evidence, the

17

factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574.

### 2.    Grievance Procedures at the MDOC

Pursuant to its PD 03.02.130, dated July, 9, 2007, the administrative remedies available at the MDOC are as follows.  First, the inmate must attempt to resolve any issue with the staff member involved within two business days of becoming aware of a grievable issue.  (DE 46-17, ¶ P.)  If the issues are not resolved within five business days, the inmate may file a Step I grievance using the appropriate form.  (*Id.*)  "Dates, times, places, and names of all those involved in the issue being grieved are to be included." (*Id.* ¶ R.)  The inmate should receive a response within fifteen business days of filing the grievance.  (*Id.* ¶ X.)

If the inmate is dissatisfied with the disposition of the grievance or does not receive a response by ten business days after the due date, he or she may file a Step II grievance using the appropriate form.  (*Id.* ¶ BB.)  As with Step I, a response to the Step II grievance should be issued within fifteen business days.  (*Id.* ¶ CC.)

Similarly, if the inmate is dissatisfied with the Step II response or does not receive a response by ten business days after the response was due, he or she may file a Step III grievance.  (*Id.* ¶ FF.)  The matter is fully exhausted after the disposition of the Step III grievance.  *Surles*, 678 F.3d at 455 ("A grievant must

undertake all steps of the MDOC process for his grievance to be considered fully exhausted.").

## C. Discussion

### 1. Findings regarding exhaustion

At issue here is whether Plaintiff exhausted his administrative remedies regarding his claims against the WCC State Defendants for failure to protect and retaliation. Here, the defendants have submitted MDOC PD 03.02.130, which sets forth the grievance procedure in clear terms, along with the affidavit or testimony of a person with knowledge, who described the process in detail; therefore, a sufficient showing that the grievance procedure is "available" to all MDOC prisoners has been made. *Bennett*, 2017 WL 3208591, at *5. Since the defendants have carried their burden of showing that there was a generally available administrative remedy, and that Plaintiff did not exhaust that remedy, the burden shifted to Plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* (citations omitted).

In *Ross v. Blake*, 136 S.Ct. 1850, 1858-59 (2016), the Supreme Court concluded that if the prisoner is effectively barred from pursuing a remedy by policy or by the interference of officials, the grievance process is not available, and

19

exhaustion is not required.  Specifically, the Court articulated three scenarios under

which a prison's grievance procedures may be rendered unavailable:

> As relevant here, there are three kinds of circumstances in which an
> administrative remedy, although officially on the books, is not capable
> of use to obtain relief.  First, an administrative procedure is unavailable
> when it operates as a simple dead end—with officers unable or
> consistently unwilling to provide any relief to aggrieved inmates.  Next,
> an administrative scheme might be so opaque that it becomes,
> practically speaking, incapable of use—i.e., some mechanism exists to
> provide relief, but no ordinary prisoners can navigate it.  And finally, a
> grievance process is rendered unavailable when prison administrators
> thwart inmates from taking advantage of it through machinations,
> misrepresentation, or intimidation.

*Id.* at 1858-1860.  Plaintiff here claims that he was thwarted from pursuing the

grievance process because he never received a response or a receipt with a

grievance identifier number for his Disputed Grievance of February 12, 2016.

### a.  The MDOC grievance process was generally available

Defendants presented sworn testimony describing the MDOC grievance

procedure and PD 03.02.130, and thus have made an initial showing that the

MDOC grievance procedure was generally available.  (DE 158 at 8; DE 46-17).

*See Bennett*, 2017 WL 3208591, at *5; *see also Lee*, 2017 WL 4158794, at *5

(finding that "defendants have made an initial showing that the grievance

procedure was generally available" although "they do not offer an affidavit

describing the grievance procedure").  Indeed, Plaintiff seemingly concedes this, as

he testified that he has "been utilizing the grievance policy going on nine years"

and that he has a "history of filing grievances and exhausting those grievances in step 3." (DE 158 at 64-65.)  Defendants also presented testimony that Plaintiff filed other grievances at WCC between January and March 2016, and thus that he utilized the grievance process during the time period at issue here.  (*Id.* at 44-45, 50-52.) *See Lee*, 789 F.3d at 679 (finding "no dispute that the grievance process was generally available," noting that plaintiff "submitted thirteen Step 1 grievances using the correct form in the days before and after April 10, 2007"). The parties further agree that Plaintiff did not exhaust the Disputed Grievance through Step III of the MDOC grievance process.  (DE 158 at 18-20, 63.)

### b.    Plaintiff failed to show that administrative remedies were not available to him

Plaintiff and the Defendants presented conflicting evidence at the evidentiary hearing as to whether the Disputed Grievance was properly "filed" or whether Plaintiff was "thwarted" from pursuing the grievance process.  Plaintiff testified that he submitted a grievance at WCC on February 12, 2016, but that he did not receive a response to this grievance nor a receipt with a grievance identifier number, and that he therefore could not pursue it through the grievance process. (DE 158 at 63.)  He relies on the exhibit attached to his response to Defendants' motion for summary judgment, which does not contain a grievance identifier number as it is his "goldenrod" copy, as evidence that he filed the Disputed Grievance. (*Id.* citing DE 88 at 25).  Defendants contend that the Disputed

21

Grievance was never received by the grievance coordinator at WCC and thus was never "filed." (*Id.* at 44-45.)

I find, based on a review of totality of the testimony and evidence presented at the September 12, 2018 evidentiary hearing, that the preponderance of the evidence supports a finding that Plaintiff did not file the Disputed Grievance as required by MDOC PD 03.02.130 and that he, therefore, has not exhausted his administrative remedies as to his constitutional claims against the WCC State Defendants. In making this finding, I am not discounting Plaintiff's credibility based on his demeanor or body language during the evidentiary hearing, but rather on a review of the totality of the testimonial and documentary evidence presented and inconsistencies in the facts and testimony, including Plaintiff's own self-proclaimed pattern and practice. I find Giraud's testimony overall to be credible. I also note that Russell's testimony, aside from that testimony broadly describing the MDOC grievance procedure, was directed primarily to his duties at overseeing Step III grievance appeals and thus was largely irrelevant to the issue here—whether Plaintiff was thwarted from filing his Step I grievance at WCC—and thus generally unhelpful to resolving that issue.

### i.    There is no credible evidence that Plaintiff submitted the Disputed Grievance

While Plaintiff claims that he filed the Disputed Grievance on February 12, 2016, and that he kept the "goldenrod" copy for his records as evidence of that

filing, I find that Giraud credibly testified that she does not remember receiving the Disputed Grievance and that it was not among the grievances Plaintiff filed at WCC between January and March 2016.  (DE 158 at 44-45, 50-52, 58-59.)  Giraud explained her procedure for processing Step I grievances she receives at WCC, which includes writing the date received on the top of the form, assigning a grievance identifier number, assigning the grievance to a respondent, and then printing a grievance receipt for the prisoner to keep with their goldenrod copy of the grievance.  (DE 158 at 42-43.)  The Disputed Grievance does not note that it was received by Giraud and does not contain a grievance identifier number, and Plaintiff concedes that he did not receive a response or a grievance receipt for it. (DE 158 at 63; DE 88 at 25.) And, while Giraud conceded that it is possible that a grievance could be deposited in a mailbox but not make it to her office, the mere "possibility" that a grievance could be lost or not make it to Giraud's office for some reason does not establish that Plaintiff's efforts at exhaustion here were "thwarted" or that the grievance procedure was otherwise unavailable to him.  Nor does it prove that he actually submitted his grievance to the prison.

The underlying facts in *Lee v. Willey*, 789 F.3d 673 (6th Cir. 2015) are similar.  In that case, the plaintiff claimed that after a defendant refused to give him a grievance form when he asked for one, he submitted a substitute grievance letter by placing it in the "kite box" designated for grievances.  *Id.* at 679 (assuming that

23

if this happened, it would be sufficient to exhaust under the circumstances). Defendants disputed that the grievance letter was ever submitted, and the district court held a bench trial to resolve the disputed issues of fact regarding exhaustion. The Court noted that the grievance letter at issue had no notation of being received, and the plaintiff acknowledged that he had received no written response to it. *Id.* Further, the defendants testified that they had not seen or received the grievance letter, and that if they had they would have escalated the matter. *Id.* at 679-80. The district judge found that the defendants had presented sufficient evidence to refute the plaintiff's testimony, and that the plaintiff therefore failed to exhaust his administrative remedies. *Id.* Following the Supreme Court's guidance in *Anderson, supra*, the Sixth Circuit recognized on appeal that it "must give due regard to the trial court's opportunity to judge the witnesses' credibility" and that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 680 (citing *Anderson*, 470 U.S. at 574; Fed. R. Civ. P. 52(a)(6)) (finding that "it was not clearly erroneous for the district court to find by a preponderance of the evidence that the substitute grievance letter was not submitted by Lee on April 10, 2007").

### ii. Plaintiff's practice of keeping a stack of grievances in his possession

I further note that Plaintiff here testified that it is his practice to keep a "stack" of grievance forms and other stationary in his possession and that he used

24

one of these forms from his "stack" to file the Disputed Grievance. (DE 158 at 66-67).  However, this evidence cuts both ways.  Because he admittedly keeps a "stack" of blank grievance forms in his possession, he could have drafted the Disputed Grievance at any time, even well after when he claims to have done so, or he could easily have submitted another grievance, complaining that his first grievance had been ignored or lost, which further diminishes the likelihood that Plaintiff properly attempted to exhaust his administrative remedies here.  In addition, it is unlikely that Plaintiff would have *added* the WCC State Defendants and the alleged February 12, 2016 assault to his April 2016 Step II appeal of his *previously filed grievance at MBP* (Grievance No. MBP-16-02-0363-17i) if he truly believed he had already filed the Disputed Grievance at WCC in February 2016 against the same parties regarding that same incident.

### iii.    Plaintiff's pattern and practice of sending kites

Further, while Plaintiff testified that he "always send[s] kites when [he doesn't] receive responses to [his] grievances[,]" and claims that he sent a kite "to inquire whether or not [the Disputed Grievance] was received," he also testified that it is his usual practice to keep a copy of his kites; but for some reason he did not do so in this case.  (DE 158 at 67-68.)  Moreover, Giraud testified that she does not remember seeing a such a kite from Plaintiff, and she further explained that if she had received one, she would have either asked him to send her a copy of the

25

grievance or she would have gone to see Plaintiff to read and obtain a copy his

goldenrod copy so that she could compare it to the grievances she had received.

(*Id.* at 56.)  If she had not received the grievance, she would "let him know so he

can refile it."  (*Id.*)

### iv.    Plaintiff's failure to attempt to proceed to Step II or Step III of the grievance process

Plaintiff also testified that he is well-versed in MDOC PD 03.02.130 because

he has a "history of filing grievances and exhausting those grievances in step 3"

and that he has "been utilizing the grievance policy going on nine years."  (DE 158

at 64-65.)  Pursuant to the MDOC grievance policy, a grievant may file a Step II or

Step III grievance when he does not receive a timely response.  (DE 46-16 at

¶¶BB, FF.)  Here, it is undisputed that, despite Plaintiff's long-standing familiarity

with the MDOC grievance policy, he did not attempt to proceed to Step II or Step

III of the grievance process after he asserts he failed to receive a timely response to

his Step I grievance (DE 158 at 63).  Plaintiff also admittedly has, in the past, used

an old appeal form with a different grievance identifier number on it when he has

not received a response to meet the appeal deadlines, but he did not do so in this

case.  (DE 158 at 70 ("I've even handwritten grievances to where I didn't even

receive proper forms to appeal.  I done made my own appeals before, which you

have copies of."); DE 88 at 21.)  The unlikely scenario of him taking no such steps

on this occasion, in light of his knowledge and history, further undermines the

credibility of his narrative. Courts have held in other cases, including one

involving Plaintiff, that such inaction constitutes a failure to exhaust. *See*

*Alexander v. Lee*, No. 2:16-cv-74, 2017 WL 4411812, at *4 (W.D. Mich. Apr. 19,

2017) (holding that plaintiff failed to exhaust his administrative remedies against

defendant, even though he claims he handed his grievance to a correction officer

but never received a response, because he failed to pursue it to Step II or Step III,

as required by MDOC PD 03.02.130 ¶¶ BB, FF), *report and recommendation*

*adopted*, 2017 WL 4348872 (W.D. Mich. Sept. 29, 2017); *see also Robinson v.*

*Deangelo*, No. 16-10264, 2017 WL 743751, at *5 (E.D. Mich. Jan. 26, 2017)

("Here, while plaintiff contends that he never received grievance numbers or

copies of his Step I grievances, he does not explain how this prevented him from

attempting to file subsequent steps in the grievance process, such that the process

was rendered 'unavailable.' Though filing subsequent steps in the grievance

process may be slightly impaired by not having the grievance number properly

identified on the paperwork, nothing in this record suggests that plaintiff was

thwarted from completing the grievance process because of this issue."), *report*

*and recommendation adopted*, 2017 WL 733249 (E.D. Mich. Feb. 24, 2017);

*Sanders v. Mich. Dep't of Corr.*, No. 11-12563, 2014 WL 2993751, at *4 (E.D.

Mich. Mar. 31, 2014) ("Moreover, even assuming that Plaintiff filed a grievance

and received no response, the Policy Directive provides that a grievance appeal can

27

be filed within 10 days after the response deadline expires. Plaintiff has provided

nothing to show that he appealed his alleged grievance against Martin to Step II or

Step III.") (internal citation omitted), *report and recommendation adopted in*

*relevant part*, 2014 WL 2993735 (E.D. Mich. July 3, 2014).

### v. Plaintiff's failure to otherwise pursue a response to the grievance

Plaintiff further testified that not receiving a response to a grievance

"happens all the time" and that when this has happened in the past, he has either

filed the grievance multiple times to get a response or tried to have it personally

delivered by a staff member. (DE 158 at 70-71.)[4] Inexplicably, he did not do either

of those things here, despite his "habit of filing grievances and vindicating [his]

---

[4] I note that Plaintiff has made this exact same claim—that he never received a receipt or response to a Step I grievance and thus should be found to have exhausted his available administrative remedies—in other lawsuits, with mixed results. *Compare Alexander v. Govern*, No. 2:16-cv-166 at DEs 53, 55 (finding after an evidentiary hearing that plaintiff exhausted his administrative remedies based on his testimony that he gave Step I grievances to corrections officers but never received a response); *with Alexander v. Lee*, No. 2:16-cv-74, 2017 WL 4411812, at *4 (W.D. Mich. Apr. 19, 2017) (holding that plaintiff failed to exhaust his administrative remedies against defendant, even though he claims he handed his grievance to a correction officer but never received a response, because he failed to pursue it to Step II or Step III, as required by MDOC PD 03.02.130 ¶¶ BB, FF), *adopted in part and rejected in part on other grounds*, 2017 WL 4348872 (W.D. Mich. Sept. 29, 2017); *see also Alexander v. Hoffman*, No. 16-cv-12069, 2017 WL 3946258, at *3 ((E.D. Mich. Sept. 8, 2017) (Berg, J.) (denying defendant's motion for summary judgment based on plaintiff's failure to exhaust administrative remedies, but *without* holding an evidentiary hearing, because defendant failed to provide any evidence rebutting plaintiff's claim that he submitted a grievance but that defendants refused to file or process it).

rights anytime [he] believes they have been violated," for which he seeks notice under Fed. R. Civ. P. 406.  (*Id.* at 68.)  Further, while Defendants presented evidence that Plaintiff has in the past filed a grievance complaining that he submitted grievances but never received a response or receipt (DE 167), he admits that <u>he did not do so in this case</u>. (DE 158 at 58, 68.)  *See Robinson*, 2017 WL 743751, at *5 ("Having taken several other grievances to Step III at the same facility in prior years, it is evidence that plaintiff understands the process and is capable of navigating the administrative procedures.").

In sum, while there are two permissible views of the evidence, *Anderson*, 470 U.S. at 574, my review of the totality of the testimony and evidence leads me to conclude that Plaintiff's version of events lacks credibility and consistency. Accordingly, for all the reasons above, I find that Plaintiff has not demonstrated that the grievance process was unavailable to him or that he was otherwise "thwarted" from completing the grievance process and Defendants have met their burden of proving that Plaintiff has failed to exhaust his administrative remedies as to his Eighth Amendment and retaliation claims against the WCC State Defendants.

### D.    Conclusion

Based on the finding above that Plaintiff has failed to exhaust his administrative remedies with regard to his constitutional claims against the WCC

State Defendants, the WCC State Defendants have carried their burden of proving their affirmative defense of non-exhaustion and they are entitled to summary judgment on Plaintiff's Eighth Amendment and retaliation claims against them.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.


Dated: November 30, 2018                     s/*Anthony P. Patti*

                                             Anthony P. Patti
                                             UNITED STATES MAGISTRATE JUDGE